[752 NYS2d 339]

In the Matter of SUSAN ALLEN, Respondent, v SCOTT A.
STROUGH, as President of the Board of Trustees of the
Freeholders and Commonalty of the Town of Southamp-
ton, et al., Appellants.

Second Department, October 15, 2002

APPEARANCES OF COUNSEL

*Hodgson Russ, LLP,* New York City (*Scott E. Silberfein* and *Stephen A. Aschettno* of counsel), for appellants.

*Anthonty B. Tohill, P.C.,* Riverhead, for respondent.

OPINION OF THE COURT

PRUDENTI, P.J.

The case now under review, and the case of *Matter of Poster v Strough* (— AD2d — [decided herewith]), reflect particular facets of a larger question, that is, the extent to which responsible government agencies should protect individual investments in shore-front properties at the risk of exacerbating the overall problem of coastal erosion to the detriment of the public at large. One particularly narrow aspect of this question is whether the Board of Trustees of the Freeholders and Commonalty of the Town of Southampton (hereinafter the Board) exceeded its jurisdiction in denying an application by Susan Allen, and a similar application by her neighbor, John F. Poster (*see Poster*), for permission to construct rock revetments, without the protection of which, they fear, their houses are doomed to eventual destruction. Resolution of this question hinges entirely on an interpretation of the term "ocean beach area" as defined in the Rules and Regulations for the Management and Products of the Waters of the Town of Southampton (hereinafter the Rules) article I. Aside from the jurisdictional question, we are called upon to decide whether the Board acted arbitrarily, capriciously, or irrationally in denying these applications.

These two cases are singularly interwoven, in that the record before the Supreme Court in the present case contains

evidence which strongly preponderates in favor of the conclusion that the proposed revetment will not exacerbate the effects of erosion on neighboring properties, while the record before the Supreme Court in *Poster* strongly preponderates in favor of the contrary conclusion that the proposed revetment, like any "hard structure," will ultimately do more harm than good. Elemental considerations of fairness, not to mention notions based on principles derived from the Equal Protection Clauses of the State and Federal Constitutions, militate against piecemeal resolution of individual applications for permission to build hard structures along isolated portions of the shore line, and in favor of a uniform policy of either allowing or prohibiting the construction of new hard structures along the entire ocean front on Long Island, both within the Town of Southampton and beyond. These same considerations virtually require us to examine the records of the two appeals in conjunction with one another. In light of the particular circumstances presented in these two contrasting cases, in which the Supreme Court issued what on the surface, at least, appear to be two inconsistent judgments, we believe that a remittal for further proceedings with respect to the jurisdictional issue in both matters is warranted. Assuming that the Board is ultimately found to have jurisdiction, we also find that the Board's adherence to a policy of prohibiting the construction of new hard structures along the areas within its permit-issuing jurisdiction is not arbitrary, capricious, or irrational.

Susan Allen is the owner of a one-family house which, along with a cottage and other accessory structures, is located at 340 Gin Lane in the Town of Southampton (hereinafter the Town). This property is on the beach in the Town, and is bounded on the south by the Atlantic Ocean. Fearing that a future hurricane or severe storm could damage or destroy her house, Allen applied to the Board for permission to construct a "tapered transitional rock armor revetment."

The proposed revetment would run from east to west, roughly parallel to the water line, and would, at its west end, join the similar revetment proposed by John F. Poster (*see Poster*). At its eastern extremity, it would tie into an existing steel bulkhead on the adjacent property of Allen's neighbor to the east, Carl Spielvogel. It would be 310 feet by 28 feet, and consist of three layers: (1) a filter fabric liner, (2) a two-foot layer of 200 to 1,000 hundred-pound core stones, and (3) a top layer of five- to nine-ton armor stones. The proposed project also called for the placement of approximately 6,000 cubic yards of sand over the revetment, and for the planting of beach grass.

The application for the permit was submitted by Allen's agent, First Coastal Corporation, on or about July 22, 1998. Beginning on September 9, 1998, the Board held a public hearing on the application. The president of First Coastal Corporation, Aram V. Terchunian, vigorously argued in favor of the granting of the application. He conceded, however, that "in geological time," there is a landward migration of the sea to the south of Long Island, even while demurring on questions as to the extent to which the sea would migrate landward, say, in one person's lifetime. The participants in the hearing also debated questions as to what, if anything, could be done to save the homes that are in peril as a result of this landward migration of the sea, and as to whether the measures necessary to save such homes may be taken only at the unacceptable cost of destroying the recreational beaches enjoyed by a wider public. As illustrated more graphically by the evidence submitted by the Board to the Supreme Court in *Poster*, there is a significant body of scientific opinion which holds, essentially, that the use of hard structures to retard the process of erosion in one coastal location will merely exacerbate that process elsewhere.

At this point, it should be noted that the public hearing held was not one at which "evidence was taken, pursuant to direction by law" (CPLR 7803 [4]). The "witnesses" were not sworn, and the arguments made by the participants in the colloquy have no evidentiary value. Rather than an adjudicatory hearing in a legal sense, this "hearing" consisted of a dialog between Terchunian, on behalf of Allen, and the members of the Board, including Board President Scott A. Strough, who demonstrated a personal familiarity with the condition of the ocean beach area in the Town of Southampton, and a similar familiarity with the contours of the ongoing debate within the scientific community in regard to the question of how the shore line can best be preserved.

On October 2, 1998, Dr. Robert Dean, an expert in coastal and oceanographic engineering, examined Allen's property. In his report dated October 4, 1998, he asserted that the property exists in what can be described as a "pocket beach," located between two hard structures, that is, a seawall protecting the home of Allen's neighbor to the east, Carl Spielvogel, and a dune with an old concrete foundation to the west. He asserted that Allen's home is in jeopardy due to the possibility of a severe winter storm, and that the proposed revetment would act as an "insurance policy." He also asserted that, in his

opinion, "the proposed revetment * * * would not cause any adverse impacts to the adjacent properties."

In a letter dated October 5, 1998, Terchunian recapitulated for the members of the Board what, in his view, had been demonstrated at the prior sessions of the hearing, and forwarded a copy of Dr. Dean's report. He asserted, among other things, that the record established:

> "A. Sand waves propagating westward through the Village have caused avulsion on the Allen property, especially during a series of storms from 1993 to 1996.
>
> "B. Ms. Allen has placed in excess of 4,000 c.y. of sand in an attempt to retard erosion caused by these erosional waves. This sand placement has been ineffective and almost the entire dune has been avulsed by storm waves. In fact, erosion has exposed upland sediments.
>
> "C. In February 1998, Ms. Allen applied for and received emergency permission from the [New York State Department of Environmental Conservation hereinafter] NYSDEC and the Village of Southampton to place rocks to prevent further avulsion of her property during storms.
>
> "D. The Allen situation is unique, because the property is located between two headlands (the seawall to the east and the remains of the concrete foundation to the west) and all of the proposed dune and revetment will be landward of these two structures. The Allen project will, by location and design, be less impactive [sic] than these existing structures.
>
> "E. * * * NYSDEC has granted a permit for installing a revetment on this property * * * One of the permit requirements is that Ms. Allen cover the rock revetment with 6,100 c.y. of compatible sand and that such sand cover is replenished.
>
> "F. Ms. Allen requests that the Trustees approve the same type of permit. As support for these conditions, we submit the enclosed report prepared by First Coastal Corporation entitled, 'Allen Dune and Revetment Permit Application—Project Construction and Maintenance.' "

On November 2, 1998, the Board voted to deny the application. In a letter dated November 24, 1998, Strough advised Allen's expert that the application had been denied based on the Board's consideration of what it believed would be the project's adverse impact on the public's right to pass along the beach area.

The present hybrid proceeding and action was commenced by summons, notice of petition and petition-complaint dated March 1, 1999. In her petition-complaint, Allen alleged that, as the result of certain storm damage inflicted in 1998, as well as prior to that year, her house and her cottage were "a few feet [from and] at risk of collapse into [an] eroded area" of the beach along the Atlantic Ocean. She alleged that, during the course of the public hearing noted above, she had "proved" that the Board did not have jurisdiction over the eroded area which threatens her properties. She alleged that the evidence contained in certain photographs and drawings established that "the erosion was so severe that the entire former dune including all of its former southerly top edge were [sic] seaward of the location of the proposed revetment." Based on these circumstances, she argued that the proposed revetment was outside of the Board's jurisdiction.

Allen also alleged that the Board's act in denying her application was "arbitrary and capricious." She asserted that the Board's action also deprived her of property without just compensation in violation of the State and Federal Constitutions, and in violation of 42 USC § 1983.

In this hybrid proceeding-action, Allen sought a judgment annulling the determination dated November 2, 1998, and a judgment directing that the revetment be approved. Allen also sought a judgment declaring that the determination dated November 2, 1998, deprived her of property without just compensation, and constituted a "taking" in violation of the State and Federal Constitutions (US Const Fourteenth Amend; NY Const, art I, § 7 [a]). She also sought a money judgment in the amount of $10,000,000.

The Board submitted an answer dated February 10, 2000. Annexed to the answer were copies of the letter informing Allen of the denial of her application, copies of the "application package," a transcript of the "hearing" held beginning on September 9, 1998, and various other documents reviewed by the Board in connection with the application. As noted above, this material is largely "one-sided," in that it consists mainly of data produced in support of the arguments made by Allen's experts on behalf of a determination granting the application.

In September 2000, the Supreme Court (Underwood, J.) issued its decision directing settlement of a judgment dismissing the petition-complaint in the similar hybrid proceeding-action brought by Allen's neighbor to the west (*see Poster*). Counsel for the Board submitted a copy of Justice Underwood's decision to a different Justice of the Supreme Court who was reviewing the petition-complaint herein.

On April 23, 2001, the Supreme Court (Klein, J.) issued its decision in the case now under review. The court stated that, in her petition-complaint, Allen had alleged that her proposed revetment was landward of the primary dune, and that the Board had produced no evidence to contradict such allegation. The Supreme Court concluded that under the governing local law, the proposed revetment was thus outside the "ocean beach area" (Rules art I) so that no permit was required. The Supreme Court annulled the Board's determination for this reason alone, and severed and continued the remaining requests for relief in the petition-complaint. A judgment supposedly reflecting the terms of the decision was filed June 5, 2001; the judgment also includes a provision directing the Board to issue a new determination stating that the proposed revetment is outside its jurisdiction. The Board now appeals.

For the reasons outlined in *Poster*, the jurisdiction of the Board to grant or deny a permit in connection with the construction of the proposed revetment depends on whether the proposed revetment is within the boundaries of what the relevant local laws define as the "ocean beach area." As outlined in *Poster*, the critical landward (northern) component of this boundary is defined by reference to the crest of the primary dune. In *Poster*, his site plan showed that his proposed revetment was landward (north) of what had been the top of the dune as it existed in 1994, but essentially seaward (south) of what was referred to in the site plan as the "top of erosion scarp 10-22-98."

As in *Poster*, we conclude that, in this case, the governing local laws define the northern limit of the Board's permit-issuing jurisdiction with reference to the crest of the "primary dune" as of the date of the permit application. As in *Poster*, we find that there is an issue of fact as to whether the primary dune has been totally or partially destroyed in the vicinity of Allen's home. We hold, as we did in *Poster*, that under these circumstances, the record in this case affords no basis upon which to determine the northern limit of the "ocean beach area," and that a hearing is therefore necessary in order to permit the

parties to adduce evidence as to the location of that northern limit, in accordance either with a standard based on the location of the crest of the closest surviving portions of the primary dune located to the east and to the west of whatever portions' of such dune have been destroyed, or in accordance with some other method acceptable in the practice of surveyors.

The case now under review presents somewhat of a contrast, in that Allen's own site plan includes a line tracing what is designated as the "crest of [the] dune [as of] 1998." This drawing shows that the proposed revetment is located seaward (south) of that line. However, it is clear from a comparison of the site plan under review in *Poster* and the one under review in the case at hand, the geographical phenomenon referred to in Allen's site plan as the "crest of [the] dune [as of] 1998" is in fact the same geographical phenomenon as that described on Poster's site plan as the "top of [the] erosion scarp." It must be recalled that the revetment proposed by Allen and that proposed by Poster were to be linked. It is thus more proper to speak of one single revetment spanning two different properties than to speak of two different revetments. Review of the evidence in each case reveals that this common revetment is located landward (north) of the crest of the former dune which, as of 1998, had been wholly or partially destroyed, and seaward (south) of the erosion scarp which resulted. We accordingly conclude that, just as in *Poster*, a hearing is required in the present case in order to determine the northern limit of the "ocean beach area" (Rules art I), and in order to decide the related question whether either homeowner is obligated to apply for a permit to construct the proposed revetment.

We recognize, of course, that our review of evidence contained in the record on appeal in *Poster* in order to shed an explicative light on the issues of fact under review in the case at hand could be seen as a departure from the ordinary rule according to which the factual review powers of the Appellate Division in any particular case is confined to the content of the record which was compiled before the Supreme Court in that same case. However, we are not strictly bound by this rule in all cases. "In New York, courts may take judicial notice of a record in the same court of either the pending matter or of some other action" (*Sam & Mary Hous. Corp. v Jo/Sal Mkt. Corp.,* 100 AD2d 901, 903, *affd* 64 NY2d 1107; *Rossbach v Rosenblum,* 260 App Div 206, *affd* 284 NY 745; *Matter of Ordway,* 196 NY 95; Richardson, Evidence § 30, at 18 [Prince 10th ed]; *see also Matter of Currier [Woodlawn Cemetery],* 300 NY 162, 170; *New*

*York State Dam Ltd. Partnership v Niagara Mohawk Power Corp.*, 222 AD2d 792, 792 n; *Schmidt v Magnetic Head Corp.*, 97 AD2d 151, 158 n 3; *Matter of Bracken v Axelrod*, 93 AD2d 913; *Matter of Paciona v Marshall*, 45 AD2d 462, *affd* 35 NY2d 289; *Newitt v Newitt*, 282 App Div 81). While the taking of such notice is not mandatory (*cf. Sleasman v Sherwood*, 212 AD2d 868; *Gintell v Coleman*, 136 AD2d 515), we do not consider ourselves prohibited from taking such notice, where there are special circumstances similar to those presented here, where two separate hybrid proceeding-actions involve a challenge by two beach-front homeowners involving the same attorneys to the denial of their applications to construct what is in reality one single structure.

The case now under review here and in *Poster* are cases which, for a number of reasons, warrant simultaneous and integrated review, both at the Supreme Court level and at the agency level. As noted above, the revetment requested by both Allen and Poster is, in fact, a single hard structure running across both properties. Equal Protection Clause considerations militate in favor of similar treatment of both Poster and Allen, as well as other similarly-situated landowners, although we note that disparate treatment may ultimately not be constitutionally offensive if critical differences between the properties of various landowners can be identified. Fragmented treatment of these cases has given rise to the anomalous presence in one record on appeal of critical evidence absent from the other record on appeal. As noted above, the scientific data tending to uphold the Board's policy prohibiting hard structures is present in the record on appeal in *Poster*, and absent from the record on appeal in the case now under review. Similarly, there is essentially no evidence in *Poster* to support the conclusion that the particular hard structure proposed herein would in fact be harmless to the overall condition of the shore line, while such evidence is uniquely present in the record of the case at hand. Under these circumstances, the invocation of this Court's discretion to take judicial notice of the record in related pending proceedings becomes a virtual obligation.

In accordance with the foregoing, even assuming that the comments made by Strough during the course of the hearing held herein cannot be considered competent evidence (*cf. Matter of Forrest v Evershed*, 7 NY2d 256 [board's determination may be based on members' personal knowledge stated in record]), the fact remains that, in light of the evidence produced by the Board in connection with its responsive papers in *Poster*,

it is clear that the Board's determination to deny Allen's application, like its determination to deny the similar application of Poster, was not arbitrary, capricious, or irrational. As we noted in *Poster*, there is at most a legitimate debate over the extent to which hard structures erected to protect one particular beachfront property might exacerbate the erosion-related perils posed to other properties, and as to whether the acutely-felt interest by the owner of such property should ultimately yield to the more diffuse interest that the general public has in preserving recreational beaches. There are additional policy considerations which must be weighed, including, ultimately, the need to balance the value of a priceless natural heritage against the undeniable value of the architectural heritage which, in the cases of many threatened ocean-front homes, is also at stake. The courts do not decide these issues, which are left to other agencies of government. Here, the Board's action was consistent with its action in *Poster*, and is supported by evidence tending to show that hard structures, albeit effective in the short term, gradually and insidiously tend, in the long term, and over a wider area, to do more harm than good. For these reasons, assuming that the Board acted within its jurisdiction, the Board's determination is not subject to vacatur in this proceeding-action.

Our holding in this case, and our holding in *Poster*, are not inconsistent with this Court's decision in *Matter of Hach v Zoning Bd. of Appeals of Town of E. Hampton* (287 AD2d 500). The *Hach* case involved a property located on Gardiner's Bay in the Town of East Hampton. The record demonstrated that the Town's Zoning Board of Appeals had previously granted permission to construct revetments to various landowners whose plight could not be distinguished from that of the petitioner, to whom such permission was instead denied. East Hampton Town Code § 153-5-50 (6), under review in the *Hach* case, authorized permits for revetments only where denial would make likely an imminent, rapid, or sudden loss of the property.

In *Hach*, this Court entertained the proceeding pursuant to CPLR 7804 (g), implicitly treating the petition as one in the nature of an application for a writ of certiorari (*see* CPLR 7803 [4]). Thus, the Court applied the "substantial evidence" standard rather than the narrower "arbitrary and capricious" standard which, as discussed in *Poster*, applies in this case.

In *Hach*, this Court concluded that substantial evidence established that the petitioner's property was, in fact, in

"imminent danger" (*Hach, supra* at 501). The record under review in the present case does not warrant a similar finding. There is no evidence of any imminent danger. Considering that it is now 2002, we do not believe that the allegation that a "few" feet separate Allen's house from the erosion scarp, contained in the petition filed in 1999, constitutes such evidence. Also, in *Hach*, the Court noted that "the ZBA [had] approved revetments for neighboring properties" (*Hach, supra* at 501). Again, the same is not true in the case at hand, or at least the record does not indicate as much. Our decision in *Hach* thus illustrates circumstances which in many ways were the converse of those presented in the case now under review.

In its third point on appeal, the Board asserts that the portion of the hybrid proceeding-action seeking relief based on alleged violations of 42 USC § 1983 and an unconstitutional "taking" should also be dismissed. As noted above, the Supreme Court in this case annulled the determination on the basis that it had been made in excess of the Board's jurisdiction, and severed what amounts to the "action" portion of the hybrid proceeding-action. The Supreme Court did not, as in *Poster*, inform the parties of its intent to consider any motion for summary judgment with respect to the "action" portion of the hybrid proceeding-action. The Board, after serving its answer, never made any motion for summary judgment (*see* CPLR 3212) and never made any motion to dismiss pursuant to CPLR 7804 (f). For these procedural reasons, the Board is not entitled to a dismissal of the "action" portion of the hybrid proceeding-action on this appeal. We express no opinion on the merits of this issue.

Accordingly, the judgment is modified by deleting the first and second decretal paragraphs thereof, and by substituting therefor (1) a provision granting that portion of the hybrid proceeding-action which was to annul the determination dated November 2, 1998, on jurisdictional grounds, solely to the extent of directing a hearing on the question of the territorial jurisdiction of the Board, and (2) a provision otherwise dismissing so much of the hybrid proceeding-action as was for relief pursuant to CPLR article 78; as so modified, the judgment is affirmed, and the matter is remitted to the Supreme Court, Suffolk County, for further proceedings in accordance herewith.

FEUERSTEIN, LUCIANO and SCHMIDT, JJ., concur.

Ordered that the judgment is modified by deleting the first and second decretal paragraphs thereof, and by substituting therefor (1) a provision granting that portion of the hybrid

proceeding-action which was to annul the determination dated November 2, 1998, on jurisdictional grounds, solely to the extent of directing a hearing on the question of the territorial jurisdiction of the Board of Trustees of the Freeholders and Commonalty of the Town of Southampton, and (2) a provision otherwise dismissing so much of the hybrid proceeding-action as was for relief pursuant to CPLR article 78; as so modified, the judgment is affirmed, without costs or disbursements, and the matter is remitted to the Supreme Court, Suffolk County, for further proceedings in accordance herewith.