■ In the Matter of WESLEY R. ST. CHRISTOPHER-OTTILIE, Respondent; NORMA IRIS R. et al., Respondents; CARMEN P. et al., Intervenors-Appellants; MARIANNA G. et al., Intervenors-Respondents. MONICA DRINANE, Law Guardian, Nonparty Appellant. [763 NYS2d 76] —In a proceeding pursuant to Family Court Act article 10, (1) the nonparty Law Guardian appeals,

and the intervenors Carmen P. and Felix P. separately appeal, as limited by their briefs, from so much of an order of disposition of the Family Court, Kings County (Elkins, J.) dated May 24, 2001, as, after a dispositional hearing, directed the child's adoption by the current foster parents, Maryann G. and Rafael M., and (2) the nonparty Law Guardian appeals, as limited by her brief, from so much of an order of the same court dated July 29, 2002, as, after a hearing pursuant to Family Court Act § 1055-a, approved the plan for adoption.

Ordered that the orders are reversed insofar as appealed from, on the facts and as a matter of discretion, without costs or disbursements, and the matter is remitted for a new hearing in accordance herewith, to be conducted with all convenient speed.

The Puerto Rican Association for Community Affairs had planned to place custody of a young child born on October 15, 1998, with the child's aunt and uncle, the sister and brother-in-law of the child's natural mother, shortly after the child's birth, so that he could be raised by them together with his four older siblings (born between 1986 and 1995 or 1996), who had already been placed in the custody of the aunt and uncle and who have since been adopted by them. There is little doubt that it would have been in the best interests of the child if this plan had, in fact, been carried out. However, as a result of what one social worker witness described as "agency mishaps," the transfer of custody was delayed, and in the meantime the child naturally formed a strong attachment to the man and woman who were serving as his foster parents while legal custody was assumed by a new agency, and who knew that the child was meant to eventually be placed with his aunt and uncle.

The child formed a powerful bond with the foster parents and a change in primary physical custody of the child would, in the short term, cause the child to experience significant trauma. For example, the record supports the conclusion that, during the year 2000, when the child was approximately 14 to 26 months old, the thought of impending separation from his foster parents in connection with the schedule of visitation that had been established to enhance the child's relationship with his aunt and uncle generated a significant amount of trauma.

The central problem in this case is in determining whether this short-term trauma would have a lasting impact, and whether it would be more than compensated for by the long-term advantages that the child would experience for the

remainder of his life as the result of unification with his brothers and sisters. A social worker retained by the foster parents and a social worker for the Law Guardian gave conflicting or inconclusive opinions as to the importance of "sibling reunification," and as to a child's ability, at various stages of development, to tolerate even temporary separation from his or her "psychological parents," or to make a transition from such parents to other parents without permanent trauma.

The child is undeniably fortunate to be a recipient of great affection and solicitude in both households, and has arrived at the point where, as appropriately stated by the Family Court, he could be described as benefitting from the rule that "two families are better than one." The problem arises only because, in accordance with law, one of the two families must be recognized as the one with legal custody pending the child's adoption. The problem is compounded by the uncertainty as to whether the child's adoption by the foster parents would be approved.

Given the unusual facts of this case, a new hearing is warranted in light of the need to obtain further, and most importantly, independent, expert evidence. It is important that, in a case that raises unusual questions, such as those presented here, there be evidence derived from an independent specialist with appropriate expertise. As the Family Court noted, the social workers who expressed their viewpoints were not psychologists. The Family Court recognized that such evidence would be helpful at various points. However, no truly independent psychological evidence was obtained during the course of the hearings.

As early as May 25, 2000, in colloquy preceding the dispositional hearing, the Family Court ascertained that there was no specialist who was familiar with the child's circumstances, and expressed an interest in obtaining an expert's evaluation. During the latter course of the dispositional hearing, on February 16, 2001, the attorney for the foster parents referred to a pending evaluation of the child by a psychologist. Counsel acknowledged that the ultimate result of such evaluation might be favorable to his adversaries. The Family Court initially denied counsel's request for an adjournment based on the need to arrange for this psychologist to testify, and the hearing proceeded. Toward the end of the proceedings of that day, after witnesses referred to the child's having tantrums, and banging his head against the wall, the court expressed a desire to have a psychologist evaluate the significance of these circumstances. Counsel advised that there was an ongoing evaluation for early intervention, but was unable to say when it would be completed.

At a subsequent hearing pursuant to Family Court Act § 1055-a it was revealed that a psychological evaluation of the child had been conducted at Mount Sinai Hospital in November 2001, but that the report of the results had been sent to the foster parents. It does not seem that this report was ever obtained or reviewed by the Family Court. Subsequently, it was stated that an evaluation had been performed at Beth Israel Hospital in March 2002. The record contains no report of the results of this apparently different evaluation. The Law Guardian who represented the child during the hearings in this case interpreted a ruling made by the Family Court during the course of the proceedings of May 2, 2002, as authorizing her to arrange for a forensic examination of the child with the cooperation of the foster parents and the aunt and the uncle. The Family Court, in its decision written in connection with its order dated December 13, 2002, which is under review in a companion appeal (*see Matter of Baby Boy R.*, 307 AD2d 360 [2003] [decided herewith), and of which we take judicial notice (*see Matter of Michael B.*, 80 NY2d 299, 317-318 [1992]; *Matter of Allen v Strough,* 301 AD2d 11, 15 [2002]), referred to its prior refusal to order "new forensics." Nonetheless, expert evaluations of the child, the foster parents, the aunt, and the uncle were later arranged by the Law Guardian.

To the extent that they are revealed in the record of the companion appeal (*see Matter of Baby Boy R., supra*), we may also take notice of the circumstances surrounding the subsequent evaluation of the child, foster parents, aunt, and uncle that was arranged without the benefit of court order (*see Matter of Michael B., supra; Matter of Allen v Strough, supra*). In this evaluation, conducted by an expert retained by the Law Guardian, it was concluded, in essence, that the aunt and uncle represented the family unit which, if awarded custody, was more likely to integrate the child's "second family" into their own family group, to the extent of permitting the foster father to be the child's "padrino," that the child's ties to his siblings will "help him now and in the distant future," and that the child was, as of the time of the evaluation, able to adjust to a new home without trauma. The expert noted that a child of four or five years of age, as opposed to one closer to two years of age, could distinguish between being "out of sight" and being "out of mind," and that the prospect of a temporary period of separation from a loved one was less frightening to an older child than to a younger one.

Under the circumstances of this case, including those outlined above, and in light of the time that has elapsed due to

the delay inherent in perfecting the appeal from the order dated May 24, 2001, and in light of the pace of the psychological development of the child whose best interests are the primary concern, we conclude that "the record before us is no longer sufficient for determining" the ultimate issues presented (*Matter of Michael B., supra* at 318; *see* Family Ct Act §§ 631, 632, 1055-a [6], [7]; *Matter of Star Leslie W.,* 63 NY2d 136, 147-148 [1984]). While the record contains statements reflecting the Family Court's desire to have an independent psychological expert provide evidence, no such independent psychological evidence was ever presented during the hearings. If the Family Court considers the evaluation more recently arranged by the Law Guardian to be less than impartial, then the Family Court has the power, which should be exercised freely in the circumstances of this case, to appoint its own psychological expert (*see Plaza v Plaza,* 305 AD2d 607 [2003]; *Machado v Del Villar,* 299 AD2d 361 [2002]; *Matter of Coakley v Goins* 240 AD2d 573 [1997]; *Matter of DiMedio v DiMedio,* 233 AD2d 394 [1996]).

For these reasons, there should be a new hearing addressed to the ultimate question of what arrangement is best for the child in light of current conditions (*see Matter of Kevin C.,* 288 AD2d 311 [2001]). The Family Court, if it deems it appropriate, may direct a forensic mental health examination of the child on its own initiative, to assure itself that the record is as complete as necessary to resolve this particularly difficult case (*see* Family Ct Act § 251 [a]; *Wissink v Wissink,* 301 AD2d 36 [2002]; *Matter of Farnham v Farnham,* 252 AD2d 675 [1998]). Prudenti, P.J., Altman, Smith and Adams, JJ., concur.