[861 NYS2d 627]

THE PEOPLE OF THE STATE OF NEW YORK, by ELIOT SPITZER, ATTORNEY GENERAL OF THE STATE OF NEW YORK, Respondent, v RICHARD A. GRASSO et al., Appellants, and THE NEW YORK STOCK EXCHANGE, INC., Respondent.

RICHARD A. GRASSO, Crossclaim Plaintiff-Appellant, v THE NEW YORK STOCK EXCHANGE, INC., et al., Crossclaim Defendants-Respondents. (And a Third-Party Action.)

First Department, July 1, 2008

## APPEARANCES OF COUNSEL

*Williams & Connolly LLP,* Washington, D.C. (*Gerson A. Zwei-fach* of counsel), and *Flemming Zulack Williamson Zauderer, LLP,* New York City (*Mark C. Zauderer* and *Jonathan D. Lupkin* of counsel), for Richard A. Grasso, appellant.

*Andrew M. Cuomo, Attorney General,* New York City (*Avi Schick, David Axinn, Jeffrey P. Metzler* and *Robert Pigott* of counsel), for state respondent.

*Winston & Strawn LLP,* New York City (*Adam J. Schlatner* of counsel), for The New York Stock Exchange, Inc. and another, respondents.

## OPINION OF THE COURT

McGuire, J.

The principal issue on this appeal, and one that divides this Court, is how N-PCL 720 (b) should be construed. That provision authorizes the Attorney General to bring an action against directors or officers of a not-for-profit corporation for various forms of misconduct that injure the corporation. The interpretive issue before this Court is one that the text of N-PCL 720 (b) does not purport to address. That issue is this: if the not-for-profit corporation merges into and is succeeded by a for-profit entity, does the Attorney General continue to have authority to prosecute causes of action under N-PCL 720 (b) when the sole relief sought is the recovery of money that belongs to the for-profit entity and would inure to its benefit and the private parties who are its owners? On the basis of analogous case law, and construing N-PCL 720 (b) both in light of its evident purpose and in accordance with our obligation to construe a statute whenever reasonably possible so as to avoid serious constitutional questions, we conclude that the Attorney General's authority to prosecute the causes of action seeking that relief lapsed with the merger.

Panels of this Court have resolved two prior appeals in this action, *People v Grasso* (21 AD3d 851 [2005] [*Grasso I*]) and

*People v Grasso* (42 AD3d 126 [2007], *affd* 11 NY3d 64 [2008] [*Grasso II*]). As detailed in *Grasso II,* the Attorney General brought this action against Richard A. Grasso, the former Chairman and Chief Executive Officer (CEO) of the New York Stock Exchange (the Exchange), Kenneth G. Langone, the Chairman of the Compensation Committee of the Exchange and a member of its Board of Directors at the relevant times alleged in the complaint, and the Exchange. Grasso appeals from an order of the Supreme Court, entered October 19, 2006, (the October 19 order) that, among other things, granted the Attorney General's motion for summary judgment on liability as to his third and sixth causes of action against Grasso. Grasso and Langone also appeal from those portions of the October 19 order that denied their respective motions for summary judgment dismissing the causes of action that N-PCL 720 (b) authorizes the Attorney General to bring against an officer or director of a not-for-profit corporation—with respect to Grasso, the second and third causes of action, and with respect to Langone, the seventh and sole cause of action asserted against him—on the ground that the Attorney General lost his standing to sue under N-PCL 720 (b) because the Exchange ceased to be a not-for-profit corporation, over which the Attorney General exercises regulatory and enforcement authority under the N-PCL, when it converted itself through a series of mergers into a for-profit company, NYSE LLC, that is wholly owned by a for-profit Delaware corporation, NYSE Group.

Grasso also appeals from that portion of the October 19 order that denied in part his motion to dismiss the eighth cause of action asserted by the Attorney General against the Exchange. Supreme Court granted the motion to the extent of dismissing the claim for injunctive relief against the Exchange but denied the motion as to the claim for declaratory relief. The claim for injunctive relief sought an injunction designed to ensure compliance by the Exchange with the N-PCL, and Supreme Court agreed with Grasso that the conversion of the Exchange into a for-profit entity had mooted that claim. Supreme Court, however, rejected Grasso's contention that the claim for declaratory relief (i.e., a declaration that the Exchange had made unlawful and ultra vires payments to Grasso) was moot for the same reason. Supreme Court also rejected Grasso's contention that, because the Exchange had taken the position in its answer that the compensation at issue was ultra vires, the claim for declaratory relief should be dismissed on the ground that there

was no actual controversy between the Attorney General and the Exchange.

In addition, Grasso appeals from those portions of the October 19 order that: (a) granted the Exchange's motion for summary judgment dismissing Grasso's cross claims for breach of contract, and (b) granted the motion for summary judgment of the Exchange and John Reed, Grasso's interim successor as Chair and CEO of the Exchange, dismissing Grasso's cross claims for defamation and disparagement.

## I

The third cause of action alleges that Grasso violated his fiduciary duties to the Exchange under N-PCL 717 (a) and 720 (a) (1) (A) and (B) by influencing and accepting awards of excessive compensation during his tenure as Chairman and CEO. In addition to seeking a judgment directing Grasso to account for the alleged breaches of his fiduciary duties, the third cause of action seeks a money judgment. Specifically, it seeks "restitution to the [Exchange] of all payments to the extent [Grasso] fails to account for the lawfulness of such payments."

In granting summary judgment on liability as to the third cause of action, Supreme Court determined that Grasso had breached his fiduciary duties to the Exchange with respect to his participation in two distinct benefit programs provided by the Exchange: the Supplemental Executive Retirement Plan (SERP) and the Supplemental Executive Savings Plan (SESP). SERP is a nonqualified deferred benefit plan available to Exchange executives, with benefits determined on the basis of such factors as the executive's years of service and highest average compensation earned over a period of three consecutive years. Although Grasso did not actually participate in SERP itself, his employment agreements with the Exchange provided for an essentially equivalent benefit that the parties refer to as Grasso's SERP benefit. The SESP is a savings plan permitting Exchange executives to defer a portion of their salaries; on an annual basis, the Exchange matched, dollar-for-dollar, the first 6% of salary deferred. As discussed below, Supreme Court erred in granting summary judgment on liability with respect to SERP and SESP.

With respect to SERP, Supreme Court ruled that Grasso had "thwarted the Compensation Committee from performing its duty of care and obedience" by "fail[ing] to disclose the amount of the SERP" (13 Misc 3d 1227[A], 2006 NY Slip Op 52019[U],

*29). As a result, and despite "inadvertent knowledge the Board may have achieved" about Grasso's SERP benefit, Supreme Court concluded that the Board was not "fully informed" about the benefit (*id.* at *30). However, on the basis of the evidence relied upon by Grasso in opposing the Attorney General's motion for summary judgment, a rational trier of fact could come to a different conclusion regarding the Board's knowledge of Grasso's SERP benefit. From the deposition testimony of numerous directors and documentary evidence, the trier of fact could conclude that: the Board knew of the SERP benefit in 1995 when it authorized the payment to Grasso of the accumulated amount of the benefit in connection with its approval of Grasso's 1995 employment agreement; the Board knew of the accumulated amount of the benefit in 1999 when it approved Grasso's 1999 employment agreement, which contained a provision transferring the then-accumulated benefit to his SESP account; the Board thereafter knew the amount of the benefit when it took various actions to limit its growth; the Board knew of the accumulated amount of the benefit in 2003 when, pursuant to the 2003 employment agreement with Grasso that the Board approved after vigorous discussion and with the advice of attorneys, consultants and other experts, the Board authorized the payment of the then-accumulated benefit and provided for changes to Grasso's SERP that would cap future benefits and reduce the amount of the accumulated benefit.

Supreme Court also erred in concluding that Grasso "knew or should have known" about the Board's alleged lack of knowledge concerning his SERP benefit (*id.*). In opposing the Attorney General's motion for summary judgment, Grasso relied not only on his own testimony that he believed the directors had "complete knowledge" of his SERP benefits but also on various facts from which the trier of fact could conclude that he reasonably believed the members of the Compensation Committee and Board were knowledgeable about the fact and extent of his SERP benefit. Accordingly, Supreme Court improperly decided a disputed issue of fact in thus concluding that Grasso breached the statutory standard of care set forth in N-PCL 717 (a) and was liable despite the good faith reliance provisions of N-PCL 717 (b).

With respect to SESP, Supreme Court granted summary judgment as to liability on the basis of its conclusion of law that "an effective amendment to SESP was not made" when Grasso was paid the money credited to his SESP account pursuant to a pro-

vision of his 2003 employment agreement that the Board had approved (*id.* at \*20). According to Supreme Court, because the SESP "unequivocally bars a participant from obtaining distributions" prior to termination, this payout of Grasso's SESP money was an "ultra vires" act by the Exchange, and Grasso breached his fiduciary duty when he accepted it (*id.*). Contrary to Supreme Court's conclusion, the payout of Grasso's SESP money was not an ultra vires act. In adopting the SESP, the Board did not commit the Exchange to all of its terms for all time or in any way curtail the corporate powers of the Exchange. Rather, and the Attorney General does not contend otherwise, the Board was free to vary the terms of the program it had established. Thus, regardless of whether the 2003 employment agreement effectively amended the SESP as to Grasso (*see Credit Suisse First Boston Corp. v Pitofsky*, 4 NY3d 149, 155 [2005] [noting that "(b)y implication," a later agreement was "a valid, enforceable modification of an earlier agreement"]), the payout was not ultra vires, i.e., "beyond the scope of power allowed or granted by a corporate charter or by law" (Black's Law Dictionary 1559 [8th ed]).[1]

The dissent takes the position that the payout to Grasso of his SESP money may have been an ultra vires act despite the undisputed fact that the Board had authorized the payout when it voted (unanimously) to approve the 2003 employment agreement. Apparently, however, the dissent does not go so far as Supreme Court and the Attorney General, who both argue that when a written agreement between an employer and its employees creates a condition precedent to the receipt of a benefit, the employer cannot lawfully waive or modify that condition for one or more or all of its employees, not even in a subsequent writing duly authorized by the employer, unless the employer does so in a writing that purports to amend the original agreement. Nothing in the SESP plan itself,[2] nor in the law of contracts or corporations, requires such formalism, let alone formalism that for no substantive reason would permit employers to disavow their own considered actions (indeed, to avoid a subsequent contractual obligation) to the decided disadvantage of their employees.

---

1. Given this conclusion, we need not address Grasso's argument that the complaint does not plead that the payout was ultra vires or otherwise unauthorized because the SESP prohibits pretermination payments.

2. The SESP plan specifies that the Board enjoys "absolute discretion" to make modifications "at any time" and "in such manner" as it "deems appropriate or desirable."

But the view the dissent would adopt—that the payout may have been ultra vires because "there is affirmative evidence . . . that the Board did not intend to amend SESP so as to permit distribution to Grasso"—is not much different or much less one-sided. Contrary to basic precepts of contract law, the dissent would permit a party to a written agreement to avoid an obligation imposed by the unequivocal terms of the agreement—here, the provisions of the employment agreement authorizing the SESP payout—by pointing to extrinsic evidence purportedly showing that it did not intend to assume that obligation (*see W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990] ["Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing"]; *West, Weir & Bartel v Mary Carter Paint Co.*, 25 NY2d 535, 540 [1969] ["The rule in this State is well settled that the construction of a plain and unambiguous contract is for the court to pass on, and that circumstances extrinsic to the agreement will not be considered when the intention of the parties can be gathered from the instrument itself"]). Accordingly, besides being unsupported by any precedent or substantive reason, the dissent's view would extend an unnecessary protection to sophisticated employers and expose employees to unwarranted lawsuits seeking the return of benefits that had been authorized to be paid.

The dissent urges that because a "formal amendment" to the SESP was executed on three prior occasions, "the Board arguably established a course of conduct that undermines Grasso's argument that the payment to him constituted an amendment to SESP." But the implicit assumption—that once one "formal amendment" is executed an agreement can only be amended through another "formal amendment"—is contradicted by the "established principle[ ] of contract law" that a later agreement can, "[b]y implication" effect "a valid, enforceable modification of an earlier agreement" (*Credit Suisse,* 4 NY3d at 154-155).

The dissent also offers a variant of its view that there must be some evidence that the Board "actually intended to amend [the SESP]." Thus, it asserts that the provision of the 2003 agreement authorizing the payment of Grasso's SESP money "cannot be considered an amendment to SESP" unless the Board "knew that the payment contravened [i.e. was not authorized by] the terms of SESP." Under this view, an employer cannot lawfully enter into a valid written agreement that expressly confers upon an employee a benefit to which the employee is

not entitled under a preexisting agreement unless the employer subjectively knows that the employee is not entitled to the benefit under the preexisting agreement. Again, however, the dissent does not cite any supporting precedent and does not explain why it is necessary or sensible to require proof of such knowledge on the employer's part before the employer can be bound by, and the employee can rely on, a written agreement. Moreover, this view is inconsistent with *Credit Suisse* and basic precepts of contract law for another reason. Under this view (and the "some evidence" variant), extrinsic proof about the state of mind of the party to be bound always would be necessary to establish the validity of a written agreement that amends an earlier agreement by implication, i.e., not expressly.

For these reasons, Supreme Court erred in granting the Attorney General summary judgment as to liability on the third cause of action.[3] With respect to Grasso's appeal from the grant of summary judgment to the Attorney General as to liability on the sixth cause of action, that appeal has been rendered moot by our decision in *Grasso II*, which was decided after the October 19 order was issued. Because we dismissed the sixth cause of action (as well as the first, fourth and fifth causes of action) (42 AD3d at 144), our disposition of the prior appeal has rendered nugatory those portions of the October 19 order granting summary judgment as to liability on the sixth cause of action (*see O'Hara v Bayliner*, 248 AD2d 149 [1998]).

## II

With respect to the second, third and seventh causes of action—the ones based on the Attorney General's authority under N-PCL 720 (b) to bring an action against an officer or director of a not-for-profit corporation—Supreme Court erred in concluding that the Attorney General's authority to maintain these causes of action against Grasso and Langone was unaffected by the conversion of the Exchange into a for-profit entity. For the reasons set forth below, the motions to dismiss these causes of action on the ground that the Attorney General no

---

**3.** Upon a search of the record, we grant summary judgment dismissing so much of the third cause of action that is based on the allegedly excessive SESP since we conclude that, as a matter of law, the payout of SESP was not ultra vires. Additionally, the Attorney General's lack of authority to maintain this cause of action, discussed infra, provides a separate, independent ground on which to dismiss this cause of action.

longer has authority to maintain them should have been granted.[4]

Each of these three causes of action alleges improper conduct by a director of a not-for-profit corporation and seeks to recover very substantial sums of money for the Exchange.[5] Indeed, the payment to the Exchange by Grasso and Langone of these substantial sums is the sole relief sought by these causes of action.

Unquestionably, the Attorney General was authorized by N-PCL 720 to bring each of these causes of action. N-PCL 720, which is entitled "Actions on behalf of the corporation," provides, in subdivision (b), that "[a]n action may be brought" against directors or officers of a not-for-profit corporation for various forms of misconduct that injure the corporation—the forms of misconduct that are specified in N-PCL 719 (a) and N-PCL 720 (a)—"by the attorney general, by the corporation, or, in the right of the corporation" by various specified individu-

---

**4.** It should be noted at the outset that, as the Court of Appeals has made clear, "[c]apacity to sue is a threshold matter allied with, but conceptually distinct from, the question of standing" (*Silver v Pataki*, 96 NY2d 532, 537 [2001]). "[C]apacity concerns a litigant's power to appear and bring its grievance before the court" (*id.* [internal quotation marks omitted]), and "may depend on a litigant's status or . . . authority to sue or be sued" (*id.*). By contrast, "[s]tanding involves a determination of whether the party seeking relief has a sufficiently cognizable stake in the outcome so as to cast[ ] the dispute in a form traditionally capable of judicial resolution" (*Matter of Graziano v County of Albany*, 3 NY3d 475, 479 [2004] [internal quotation marks omitted]). Moreover, "[w]ithout both capacity and standing, a party lacks authority to sue" (*id.*). The parties, and some of the older decisions discussed below, do not always distinguish between capacity and standing. As used herein, the phrase "authority to sue" generally refers to capacity to sue.

**5.** As we observed in *Grasso II*, "the purpose of the complaint is to return to the [Exchange] the very substantial sums of money that Grasso allegedly received through unlawful means" (42 AD3d at 142). What is true of the complaint generally is true of the second, third and seventh causes of action. The second cause of action alleges that the compensation and benefits that Grasso received constitute unlawful payments or transfers of assets, and seeks a judgment directing that Grasso return the assets and payments to the Exchange; the third cause of action alleges that Grasso breached his fiduciary duties to the Exchange by accepting excessive and otherwise unlawful compensation from the Exchange, and seeks a judgment directing Grasso to make restitution to the Exchange of all payments received to the extent he fails to account for the lawfulness of the payments; the seventh cause of action alleges that Langone breached his fiduciary duties to the Exchange by misleading the Board about the amounts of compensation being paid to Grasso, and seeks a judgment directing Langone to make restitution to the Exchange of all excessive or otherwise unlawful payments made to Grasso that were caused by the alleged misconduct.

als, including a director or officer of the corporation and a member of the corporation who brings a derivative action under N-PCL 623. Obviously, N-PCL 720 (b) authorizes the Attorney General to bring such an action for the same reason it grants to the Attorney General extensive supervisory and enforcement authority (*see e.g.* N-PCL 112, 907, 1008, 1214, 1216, 1303) over not-for-profit corporations: the significant public interest in the management and affairs of not-for-profit corporations.[6] Thus, although N-PCL 720 (b) otherwise mirrors Business Corporation Law § 720 (b), the Attorney General of course is not authorized by the latter to bring an action of any kind on behalf of a for-profit corporation against an officer or director for misconduct causing injury to the corporation.

Just as unquestionably, the conversion of the Exchange into a for-profit entity did not extinguish the claims asserted on behalf of the Exchange in the second, third and seventh causes of action. Rather, Business Corporation Law § 906 (b) (3), which, by virtue of N-PCL 908 (i) (A) and (B) is applicable to conversions of not-for-profit into for-profit entities like that of the Exchange into NYSE LLC, provides that pending actions "may be enforced, prosecuted, settled or compromised as if such merger or consolidation had not occurred, or such surviving or consolidated corporation may be substituted in such action . . . in place of any constituent entity."

Simply because Business Corporation Law § 906 (b) (3) specifies that the causes of action survive, it does not follow—as the Attorney General and the dissent assume—that the Attorney General continues to have authority or standing to prosecute them. As Grasso argues, our decision in *Rubinstein v Catacosinos* (91 AD2d 445 [1983], *affd* 60 NY2d 890 [1983]) supports the opposite conclusion. After the plaintiff stockholder brought a derivative action on behalf of the corporation alleging misconduct by certain of its directors, the corporation merged into another entity and the plaintiff then ceased to be a stockholder of the corporation. Reversing Supreme Court's denial of the motion by the defendants (the corporation and its directors) to dismiss for lack of legal capacity to sue, this Court stated that "[i]t is settled law that a plaintiff stockholder in a

---

**6.** That public interest is reflected as well in other sections of the N-PCL, including its provisions requiring the approval of Supreme Court for certain transactions involving mergers or consolidations of not-for-profit corporations (*see* N-PCL 907, 908 [f]). Needless to say, the Business Corporation Law contains no analogous provisions (*see* Business Corporation Law art 9).

stockholder's derivative action loses his right to continue to prosecute the action if he ceases to be a stockholder" (*id.* at 446). Moreover, this Court concluded that Business Corporation Law § 906 (b) (3),

"which permits the continuation of a shareholder's action on behalf of a merged corporation, should fairly be construed to mean the continuation of the claim on behalf of the corporation but not to preserve standing of a now nonstockholder to enforce that claim on behalf of the corporation against that corporation's will" (*id.* at 447).[7]

At first blush, a decision of the Court of Appeals that the parties do not cite, *Tenney v Rosenthal* (6 NY2d 204 [1959]), might appear to support the Attorney General's position. In *Tenney*, after the plaintiff director brought an action on behalf of the corporation against other directors alleging that they had breached their fiduciary duties to the corporation, the plaintiff was not reelected as a director. As a director, the plaintiff was authorized to bring the action on behalf of the corporation under the then applicable statute. Construing that statute, the Court of Appeals held that the plaintiff did not automatically lose his authority to sue when he failed to be reelected as a director (*id.* at 209-210). The Court noted "the rule of automatic disqualification of the plaintiff shareholder in a derivative action, when he ceases to be a shareholder" (*id.* at 212-213), but concluded that "[i]n the absence of legislative direction" the Court was not "warranted in extending [that rule] to the director's derivative action" (*id.* at 213).

The Court so held for two reasons. First, likening a director to a guardian ad litem, the Court reasoned that "[o]nce he has

---

**7.** Of course, the Exchange is not seeking dismissal of the causes of action against Grasso and Langone. However, that is hardly surprising or significant. Neither the Exchange, the surviving, for-profit entity (NYSE LLC), the for-profit entity that wholly owns NYSE LLC (NYSE Group) nor its owners are incurring any of the costs of prosecuting these causes of action. Rather, their prosecution by the Attorney General presents the for-profit owners of the Exchange with the possibility of a large money judgment whose provision would be paid for in full by New York taxpayers.

In any event, this Court buttressed its holding in *Rubinstein v Catacosinos* with the observation that the plaintiff would "get no benefit from the judgment" and "has no interest in the case" (*id.* at 447). In addition, this Court noted that there was no allegation of any wrongdoing by the successor corporation (*id.*). As discussed below, the Attorney General no longer has a legitimate interest in these causes of action. Obviously, moreover, neither the current owners nor the managers of the Exchange are alleged to have committed any wrongdoing.

been properly appointed [as a director] . . . , his standing is in no way affected by the fact that he is a stranger to his ward. His fiduciary obligations as a guardian ad litem . . . are in no way diminished by his loss of status as a director" (*id.* at 211-212). Thus, the "public policy" (*id.* at 211) concerns that led the Legislature to grant to a director the right to sue continued to exist.

Here, by contrast, we are not concerned with any postcommencement loss of status on the part of the plaintiff; the Attorney General remains the Attorney General. Rather, the relevant change is in the nature of the entity on behalf of which the action was commenced. As a result of the merger, that entity no longer exists and its successor is not a not-for-profit corporation over which the Attorney General can exercise the broad regulatory and enforcement authority conferred by the N-PCL; thus, the public policy concerns supporting that authority and the right to bring certain actions on behalf of not-for-profit corporations no longer exist. To continue the metaphor employed in *Tenney,* the ward came of age and no longer needs the guardian's protection.

Indeed, in *People v Ingersoll* (58 NY 1 [1874]), the absence of any need for the Attorney General to bring suit played a decisive role in the Court of Appeals' conclusion that the Attorney General lacked authority to bring an action to recover money for a municipal corporation. That authority, the Court ruled, "cannot be rested upon the general sovereignty of the State and its rights and duties as *parens patriae*" (*id.* at 30). The parens patriae power, the "nursing quality" of the State (*id.*), conferred no such authority, because "a corporation with full power to acquire and hold property, create debts, levy taxes and sue and be sued, with a competent board of governors, is not within th[e] class of incompetents in need of the exercise of this nursing quality of the State government" (*id.*).

Similarly, in *People v Lowe* (117 NY 175 [1889]), the Attorney General brought an action to recover money for a private corporation against trustees of the corporation who allegedly had committed misconduct. Although the Court reversed the judgment against the trustees without reaching the issue of the Attorney General's authority to maintain the action, it stated:

> "Neither public nor private interests require the maintenance of such an action as this. The private parties who feel aggrieved . . . have ample remedies

> to redress their wrongs by proceedings in their own names; and why should not the complaining members of this corporation redress them in that way at their own expense and risk?" (*Id.* at 195.)

The power of that rhetorical question applies with equal force here, for the Attorney General's assistance is just as unnecessary here as it was in *Ingersoll* and *Lowe*. With the conversion of the Exchange into a for-profit entity, NYSE LLC and its for-profit direct and indirect owners (NYSE Group and its shareholders) unquestionably have powerful financial incentives to prosecute an action on behalf of the Exchange or its successor, NYSE LLC, seeking recovery of tens of millions of dollars.

As for the second reason for the holding in *Tenney,* the Court stated:

> "Strong reasons of policy dictate that, once he properly initiates an action on behalf of the corporation to vindicate its rights, a director should be privileged to see it through to conclusion. Other directors, themselves charged with fraud, misconduct or neglect, should not have the power to terminate the suit by effecting the ouster of the director-plaintiff. It is no answer to say that, if wrongs were committed, others are available to commence a new and appropriate action" (6 NY2d at 210).

Those "reasons of policy" have no applicability here. Obviously, nobody charged in this action with misconduct or neglect by the Attorney General had the power to convert the Exchange into a for-profit company, and thereby "effect[ ] the ouster" of the Attorney General as a proper party plaintiff.

Our conclusion that the Attorney General no longer has the authority to prosecute the second, third and seventh causes of action is buttressed by the principle of statutory construction that a statute should be construed in light of its evident purpose (*see e.g. Matter of Riefberg,* 58 NY2d 134, 141 [1983]). The evident purpose of N-PCL 720 (b) in granting limited authority to the Attorney General to bring certain actions on behalf of a not-for-profit corporation is to vindicate the public interest in the management and affairs of not-for-profit corporations. At least where, as here, the Attorney General seeks only monetary relief that would inure to the benefit of the owners of a for-profit entity that once had been a not-for-profit corporation, N-PCL 720 (b) should not be construed to permit the Attorney

General to continue prosecuting a cause of action brought on behalf of a not-for-profit corporation after its conversion into a for-profit entity. The prosecution of such a cause of action would vindicate only the interests of private parties, not any public interest.[8]

The Court of Appeals made this point in *People v Lowe* (117 NY 175 [1889]) in discussing the issue of whether the Attorney General had the authority to bring suit to recover money for a private corporation. After noting the public interest in "municipal, charitable, religious and eleemosynary" corporations (*id.* at 190), the Court stressed:

> "There are other corporations, much the largest number, which are in every sense private and are organized solely to subserve private interests and to promote individual, as distinguished from the public, welfare. With such corporations, so long as they keep within their chartered powers, and do not abuse or forfeit their corporate franchises, the public have no especial concern. Their affairs must be administered under general laws for the protection of the public by persons interested therein who must redress their wrongs and enforce their rights like other citizens" (*id.* at 190-191).[9]

When, as here, the Attorney General seeks only a money judgment that would inure to the benefit of a for-profit entity and its direct and indirect owners, there is yet another reason to conclude that N-PCL 720 (b) does not authorize the Attorney General to continue prosecuting causes of action on behalf of a not-for-profit corporation that has been converted into a for-profit entity. Article VII, § 8 (1) of the New York Constitution states as follows: "The money of the state shall not be given or loaned to or in aid of any private corporation or association, or private undertaking." This prohibition on, among other things,

---

**8.** Citing to a filing with the Securities and Exchange Commission in connection with the initial public offering by NYSE Group, Grasso notes that, as would be expected, the "corporation's shareholders have been told that its assets include the potential recovery from this lawsuit."

**9.** Relatedly, the conclusion that the Attorney General's authority to sue under N-PCL 720 (b) ceased when the Exchange ceased to exist as a not-for-profit corporation is supported by another principle of statutory construction (*see Zadvydas v Davis,* 533 US 678, 699 [2001] [" '*Cessante ratione legis cessat ipse lex*' (the rationale of a legal rule no longer being applicable, that rule itself no longer applies)" (quoting 1 Edward Coke, Institutes of the Laws of England, at 70b [initial parentheses omitted])]).

the "subsidization by gifts of public funds to private undertakings" (*Matter of Schulz v State of New York,* 86 NY2d 225, 233 [1995], *cert denied* 516 US 944 [1995]) remains applicable "irrespective of how beneficent or desirable to the public the subsidized activity might seem to be" (*id.* at 233-234), and "even when the subsidized private organization performs functions beneficial to the public" (*id.* at 234).

Thus, in *Matter of Schulz,* the Court of Appeals stated:

> "We think it is unassailable that the use of public funds out of a State agency's appropriation to pay for the production and distribution of campaign materials for a political party or a political candidate or partisan cause in any election would fall squarely within the prohibition of article VII, § 8 (1) of the Constitution. Manifestly, using public moneys for those purposes would constitute a subsidization of a nongovernmental entity" (86 NY2d at 234).

Here, the Attorney General is using public funds out of appropriations to his office to prosecute causes of action on behalf of an entity that is no longer a not-for-profit corporation and seeks only a money judgment that would benefit the owners of the for-profit entity into which the not-for-profit has been converted (even if the judgment nominally would be paid to the not-for-profit corporation). The Attorney General's continued prosecution of these causes of action, as is clear from *People v Ingersoll* and *People v Lowe,* vindicates no public purpose.[10] The parties do not discuss article VII, § 8 (1),[11] but we need not decide whether the use of public funds by the Attorney General to continue the prosecution of this action falls within this

---

**10.** Indeed, as we discuss below, for this same reason the Second Circuit has held that under circumstances indistinguishable from those presented here the Attorney General lacks standing to prosecute an action seeking only the recovery of money damages for injuries suffered by private parties (*People of State of N.Y. by Abrams v Seneci,* 817 F2d 1015, 1017 [2d Cir 1987]).

**11.** The potential applicability of article VII, § 8 (1) presents a question of law, unlike the fact-bound position discussed below that is advanced by the dissent, but not the Attorney General, concerning the Attorney General's intentions to ask Supreme Court to direct that any money judgment against Grasso be paid to a not-for-profit entity that is affiliated with NYSE Group (*cf. Telaro v Telaro,* 25 NY2d 433, 439 [1969] ["Of course, where new contentions could have been obviated or cured by factual showings or legal countersteps, they may not be raised on appeal"]; *Reyes v CSX Transp., Inc.,* 19 AD3d 193, 194 [2005] [although claim was not raised in original motion "we nevertheless review this claim as it presents a question of law that may be raised for the first time at this juncture"]).

constitutional prohibition. It is enough to recognize that serious constitutional questions would be raised if N-PCL 720 (b) were construed to permit the continued prosecution of these causes of action by the Attorney General, and that we are obligated whenever possible to construe a statute so as to avoid those questions (*see Jones v United States*, 526 US 227, 239 [1999] ["under the rule, repeatedly affirmed, that where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter" (internal quotation marks omitted)]).[12]

Another significant constitutional question would be avoided by construing N-PCL 720 (b) not to authorize the continued prosecution of a cause of action by the Attorney General under the circumstance presented here. The Legislature, consistent with the principles of separation of powers underlying the requirement of standing (*see Raines v Byrd*, 521 US 811, 820 [1997]), cannot grant the right to sue to a plaintiff who does not have standing (*id.* at 820 n 3). That a plaintiff has standing at the outset of an action is not sufficient. Rather, "since it goes to the very power of the court to act, [standing] must exist at all stages of the proceeding, and not merely when the action is initiated or during an initial appeal" (*Safir v Dole*, 718 F2d 475, 481 [DC Cir 1983], *cert denied* 467 US 1206 [1984]; *see also Stark v Goldberg*, 297 AD2d 203, 204 [2002] [because "(s)tanding goes to the jurisdictional basis of a court's authority to adjudicate a dispute," action dismissed sua sponte on standing grounds "despite the lack of any assertion by defendants of an objection to plaintiffs' standing"]).[13]

---

**12.** Although Supreme Court's ruling that the Attorney General continued to have standing despite the merger was based in part on the continuing public interest in "the integrity of the market" (13 Misc 3d 1227[A], 2006 NY Slip Op 52019[U] at *11), the Attorney General does not argue in his brief that his standing should be upheld on this ground. Nonetheless, the dissent does advance this argument; the particular contentions of the dissent will be addressed below. For present purposes, two points should be made. First, the payment by Grasso or Langone of very substantial sums of money to the Exchange—the sole relief sought by the second, third and seventh causes of action—is irrelevant to the integrity of trading on the floor of the entity that used to be the Exchange (*see Seneci*, 817 F2d at 1017-1018). Second, the strictures of article VII, § 8 (1) apply "even when the subsidized private organization performs functions beneficial to the public" (*Matter of Schulz*, 86 NY2d at 234).

**13.** As discussed below, the dissent is clearly wrong in asserting that because the New York State Constitution does not contain a textual analogue

The Attorney General, "like all other parties to actions, must show an interest in the subject-matter of the litigation to entitle [him] to prosecute a suit and demand relief" (*People v Lowe*, 117 NY at 191). The parens patriae standing of the Attorney General, however, does not permit him "to represent the interests of particular citizens who, for whatever reason, cannot represent themselves" (*Alfred L. Snapp & Son, Inc. v Puerto Rico ex rel. Barez*, 458 US 592, 600 [1982]). Rather, "the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. The State must express a quasi-sovereign interest" (*id.* at 607; *see also Pennsylvania v New Jersey*, 426 US 660, 665 [1976] [a state has parens patriae standing "only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens"]; *People of State of N.Y. by Vacco v Operation Rescue Natl.*, 80 F3d 64, 71-72 [2d Cir 1996] [parens patriae standing "does not extend to the vindication of the private interests of third parties"], *cert denied sub nom. Broderick v United States*, 519 US 825 [1996]). Whatever the alleged injury to the plaintiff may be, it must be "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief" (*Allen v Wright*, 468 US 737, 751 [1984]).

The Second Circuit's decision in *Seneci* (817 F2d 1015 [1987]) is particularly instructive. In that case, the issue was "whether the Attorney General, suing as *parens patriae*, may obtain under RICO [the Racketeer Influenced and Corrupt Organizations Act (18 USC §§ 1961-1968)] an order directing payment of treble damages to its citizen-consumers injured by defendants' alleged illegalities" (*id.* at 1017). The court held that the Attorney General lacked standing, reasoning that because "the complaint only seeks to recover money damages for injuries suffered by individuals, the award of money damages will not compensate the state for any harm done to its quasi-sovereign interests" (*id.*). Especially given the dissent's claim that the continued prosecution of this action somehow is relevant to the integrity of trading on the floor of the entity that used to be the Exchange, the penultimate paragraph of the decision in *Seneci* warrants quotation in full:

---

to the case or controversy clause of the federal constitution (US Const, art III, § 2 [1]) "there is no constitutional concern whatsoever" with construing N-PCL 720 (b) to authorize the continued prosecution by the Attorney General, following the merger of a not-for-profit corporation into a for-profit entity, of causes of action that seek only the recovery of money.

"To be sure, in this case the Attorney General alleges that the defendants' conduct has caused substantial injury to the integrity of the state's marketplace and the economic well-being of all its citizens. Since, however, the monetary relief sought by the complaint is not designed to compensate the state for those damages, the asserted presence of such damages cannot serve as the foundation for the state's authority to act here as the representative of its citizens" (*id.* at 1017-1018).

Moreover, *People v Ingersoll* and *People v Lowe* also cast grave doubt, at the very least, on the Attorney General's continued standing or authority to prosecute the second, third and seventh causes of action under N-PCL 720 (b). In *Ingersoll,* the Court of Appeals rejected the Attorney General's claim that he had parens patriae power to bring an action seeking the recovery of money for a municipal corporation that the defendants allegedly obtained "by false and fraudulent means and devices" (58 NY at 12). As the Court stated:

"It is not in terms averred that the money, in any legal sense or in equity and good conscience, belonged to the [State] . . . , or that the wrong was perpetrated directly against the State or the people of the State, that is, the whole State as a legal entity, and the whole body of the people . . . . The title to and ownership of the money sought to be recovered must determine the right of action, and if the money did not belong to the State, but did belong to some other body having capacity to sue, this action cannot be maintained" (*id.* at 12-13).

And in *Lowe,* as noted earlier, the Attorney General similarly sought to recover money for a private corporation from trustees who allegedly committed misconduct. As the Court stated, however, "[i]t is not sufficient for the People to show that wrong has been done to some one; the wrong must appear to be done to the People in order to support an action by the People for its redress" (117 NY at 192).

In *Ingersoll,* the Court suggested the possibility of an exception to the rule that "[i]f the property of a corporation be illegally interfered with by corporation officers and agents or others, the remedy is by action at the suit of the corporation, and not of the attorney-general" (58 NY at 16). Thus, the Court wrote as follows:

"If there were no other remedy for a great wrong, and public justice and individual rights were likely to suffer for want of a prosecutor capable of pursuing the wrong-doer and redressing the wrong, the courts would struggle hard to find authority for the attorney-general to intervene in the name of the people. But, in the absence of such a necessity, the exercise of high prerogative powers ought not, by a species of judicial legislation, to be committed to the discretion of any individual or body of men" (*id.* at 17).

As noted, nothing in the text of N-PCL 720 (b) purports to grant continued authority to sue to the Attorney General whenever a not-for-profit corporation merges into a for-profit entity. It should not be construed, "by a species of judicial legislation," to grant such authority. To do so would invite rather than avoid "grave and doubtful constitutional questions" (*Jones*, 526 US at 239) about the authority of the Legislature, consistent with separation of powers, to grant standing to the Attorney General to prosecute an action seeking only the recovery of money for a for-profit entity to redress an alleged wrong that was not "perpetrated directly against the State" (*Ingersoll*, 58 NY at 13).

The dissent advances several grounds for its conclusion that the Attorney General's authority to sue is unaffected by the conversion of the Exchange into its for-profit successor entity, NYSE LLC. First, the dissent relies on the formation by NYSE LLC under the N-PCL of a not-for-profit subsidiary, NYSE Regulation, Inc. The dissent thus revives not an argument but a hint of an argument made by the Attorney General in his opposition in Supreme Court to the motions of Grasso and Langone to dismiss on standing grounds,[14] a hint that the Attorney General has wholly abandoned on this appeal.

That the Attorney General makes no argument in this Court that NYSE Regulation supports or has anything to do with his continued standing or authority to sue is not surprising. Prior to the merger, both the three causes of action asserted by the

---

**14.** In the memorandum of law he submitted to Supreme Court, the Attorney General devoted but a few sentences of his statement of facts to the formation and corporate purposes of NYSE Regulation. However, in the argument portion of his memorandum, consisting of two separate points, the Attorney General not only did not argue that the existence of NYSE Regulation was relevant to his continued standing or authority to sue, he made no mention at all of NYSE Regulation.

Attorney General under N-PCL 720 (b) and the right of recovery thereon belonged to the Exchange (*see Bertoni v Catucci*, 117 AD2d 892, 894 [1986] [construing Business Corporation Law § 720]; *see also Rapoport v Schneider*, 29 NY2d 396, 401 [1972] [noting in action brought pursuant to Business Corporation Law § 720 that "any benefit derived from this action would accrue to the corporation"]; 14A NY Jur 2d, Business Relationships § 737, at 393 [2d ed 2006] ["The proceeds or results of an action under (Business Corporation Law § 720) inure to the benefit of the corporation or its creditors or shareholders, and not to the particular benefit of the individual prosecuting it"]).

Indisputably, the successor entity to the Exchange is NYSE LLC. Just as indisputably, "a cause of action existing in favor of a corporation survives its merger into or consolidation with another corporation *and becomes vested in the surviving or new corporation*" (*Platt Corp. v Platt*, 21 AD2d 116, 120-121 [1964] [emphasis added], *affd* 15 NY2d 705 [1965]). To be sure, Business Corporation Law § 906 (b) (3) ensures that the cause of action also can continue to be maintained by the premerger entity. But it goes on to specify that "such surviving or consolidated corporation may be substituted in such action or special proceeding in place of any constituent entity."[15] The position of the dissent is, in essence, that the premerger cause of action also belongs to an affiliate of the surviving entity created after the merger so long as the affiliate bears a sufficient "functional relation" to the premerger entity. Thus, the dissent would impermissibly rewrite the statute (*see Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382, 394 [1995]), which permits only the "surviving or consolidated corporation" to be substituted in place of the constituent entity. Apart from being inconsistent with the statutory text, the dissent's position is imprudent because of the uncertainty it would create concerning which postmerger affiliates would have a claim to a premerger cause of action brought by a constituent entity (*cf. Reliance Ins. Co. v PolyVision Corp.*, 9 NY3d 52, 58 [2007] ["We are, moreover, mindful of the potential ramifications of a rule allowing a 'different, related corporate entity' the benefit of the statutory grace period, not knowing precisely what that means or

---

**15.** The term "constituent corporation" plainly excludes an entity such as NYSE Regulation that is created at the time of or after the merger (*see* Business Corporation Law § 901 [b] [3] [defining the term "(c)onstituent corporation" to "mean() an existing corporation that is participating in the merger or consolidation with one or more other corporations"]).

portends"]).[16] The dissent stresses that both in the brief he submitted to this Court in *Grasso II* and before Supreme Court during oral argument of the motion that resulted in that appeal, the Attorney General "clearly indicated . . . that he intends to ask the court, should he prevail in securing a judgment against Grasso, to order that any sums recovered be returned [*sic*] to NYSE Regulation, Inc." Even putting aside the fact that the Attorney General indicates no such thing in his brief to this Court on this appeal and never so indicated in his submission to Supreme Court opposing the motion to dismiss on standing grounds that resulted in this appeal, the Attorney General's intentions are irrelevant. First, the Attorney General has never sought to amend the complaint to reflect this intention. The three causes of action brought under N-PCL 720 (b) seek judgments requiring Grasso and Langone to make restitution or other payments of money to the Exchange, not NYSE Regulation.

Second, and more fundamentally, the right of recovery under these three causes of action belongs to the Exchange's successor, NYSE LLC. The dissent does not and cannot cite any authority for the extraordinary proposition that when an action is successfully brought under N-PCL 720 or Business Corporation Law § 720, a trial court has some plenary authority to enter a judgment at the behest of the plaintiff in favor of a corporation other than the one on behalf of which the action was brought. Instead, the dissent offers only that such authority has been "acknowledged" by the Exchange. But even the far from disinterested statement by one of the Exchange's lawyers that the dissent cites—a statement the Attorney General did not rely on or even call this Court's attention to on this appeal—is not so bold as to tout the legal conclusion that such authority inheres in the trial court.[17] Even assuming both that NYSE LLC could consent to the entry of a judgment directing Grasso and Langone to pay NYSE Regulation and that Grasso

**16.** Moreover, as Grasso also emphasized in his submissions to Supreme Court, the filing by NYSE Group with the Securities and Exchange Commission in connection with the merger also makes clear that the assets assigned to NYSE Regulation by NYSE LLC did not include the right to recover the millions of dollars sought from Grasso and Langone in the three causes of action brought for the benefit of the Exchange pursuant to N-PCL 720 (b).

**17.** If and to the extent the dissent is of the view that such authority is conferred by the definition of the term "NYSE" contained in a filing by NYSE Group, Inc. with the Securities and Exchange Commission, we respectfully disagree.

and Langone lawfully could be required to pay NYSE Regulation (provided, presumably, appropriate releases were executed by NYSE LLC), that would only serve to underscore that the right of recovery under the second, third and seventh causes of action no longer belongs to a not-for-profit corporation but to NYSE LLC, a for-profit corporation.

Apart from its misplaced reliance on the existence of NYSE Regulation, the dissent also relies on an erroneous reading of Business Corporation Law § 906 (b) (3). Indeed, this erroneous reading of Business Corporation Law § 906 (b) (3) pervades the dissent's analysis. This Court's decision in *Rubinstein v Catacosinos* (91 AD2d 445 [1983]) makes the very point that the dissent repeatedly misses: Business Corporation Law § 906 (b) (3) ensures the continuation, postmerger, of a claim belonging to a corporation but not the continued standing or authority to sue of whoever happens to have asserted the claim prior to the merger (*id.* at 447). This point, moreover, was central to this Court's conclusion that the shareholder who had brought the action on behalf of the corporation had lost his right to sue after the merger when he ceased to be a stockholder (*id.* at 446-447). The dissent does not and cannot come to terms with the fact that under its reading of Business Corporation Law § 906 (b) (3), the right of the shareholder in *Rubinstein* to sue would not have been affected whatsoever by the merger. Although the text of Business Corporation Law § 906 (b) (3) makes no mention of standing or authority to bring the claim, and even though *Rubinstein* is squarely to the contrary in construing Business Corporation Law § 906 (b) (3) not to address the distinct issue of standing or authority to sue, the dissent would hold that Business Corporation Law § 906 (b) (3) ensures the Attorney General's continued standing and authority to sue.

The dissent would distinguish *Rubinstein* on the ground that "the Attorney General's claims are not derivative in nature."[18] But that is clearly irrelevant. Business Corporation Law § 906 (b) (3) either addresses and guarantees the postmerger author-

---

**18.** Contrary to the dissent's claim, Grasso has not argued that when brought by the Attorney General the causes of action specified in N-PCL 720 (b) are "derivative" in nature. Rather, Grasso correctly argues that in substance all the claims against officers and directors that N-PCL 720 (b) authorizes the Attorney General (and others, including the not-for-profit corporation) to bring entail injury to the not-for-profit corporation and assert a right of recovery that belongs to that corporation. For precisely that reason, of course, the Attorney General's complaint seeks to recover very substantial sums of money from Grasso and Langone for the Exchange, not for the State.

ity of all party plaintiffs who bring a cause of action on behalf of the corporation or it does not. Under no rational reading of the statute can it be thought to differentiate among such plaintiffs so as to guarantee the postmerger authority of certain of them but not others.

We agree with the dissent that N-PCL 720 (b) "recognizes that the Attorney General brings his claims in his capacity as the State's chief law enforcement officer, not merely as a surrogate for the corporation." We also agree with the dissent that "the Attorney General's right to sue reflect[s] the Legislature's public policy determination that it is in the public interest for the Attorney General to police not-for-profit corporations." The dissent, however, illogically assumes that by granting the Attorney General the independent right to *bring* an action against officers and directors of not-for-profit corporations, the Legislature also granted the Attorney General continuous authority to *maintain* such an action even when the not-for-profit corporation has merged into and been succeeded by a for-profit corporation. The public interest that supports a police function with respect to the former does not support the latter. By assuming that the Legislature did not recognize that reality, it is the dissent that fails to respect the competency and role of the Legislature. And that failure is exacerbated by another reality: the text of N-PCL 720 (b) does not purport to say anything about the issue of the authority of the Attorney General or anyone else to maintain an action in the event of a merger of a not-for-profit corporation into a for-profit entity.

The dissent's efforts to endow the Attorney General's continued prosecution of the three causes of action brought under N-PCL 720 (b) with a public interest are not persuasive. What we said about the similar assertions made by the dissent in *Grasso II* is true here as well: "[f]rom these . . . assertions of the dissent, one might think that Grasso remained in a position of authority at the [Exchange] or that the Attorney General was seeking in this action to effectuate structural reforms at the [Exchange] that would eliminate or reduce the risk of a reoccurrence of the alleged misconduct" (42 AD3d at 142). Indeed, not only do Grasso and Langone have nothing do with the management of NYSE LLC, NYSE Group or NYSE Regulation, the dissent also ignores that virtually everything has changed since this action first was commenced. As indicated in the filings with the Securities and Exchange Commission relating to the merger that were attached as exhibits to Grasso's motion, none of the

members of the Board of Directors of the Exchange at the time of the alleged misconduct are members of the Board of Directors of NYSE LLC, NYSE Group or NYSE Regulation.

Furthermore, to prevail on one or more of the three causes of action brought under N-PCL 720 (b), the Attorney General would not be required to prove that any conduct by Grasso or Langone had any adverse consequences whatsoever for the integrity of trading on the Exchange or public confidence in the Exchange. Accordingly, the dissent's reliance on "specific allegations [in the complaint] of potentially unethical activities that go beyond the sheer amount of Grasso's pay" is misplaced. Moreover, a plaintiff surely cannot confer authority to sue or standing upon himself by making factual allegations that are not necessary to his case. The dissent nonetheless contends that "[n]ow that such allegations have been made, the people of this state have the right to have them heard so that they may know whether the [Exchange] is deserving of the confidence they place in it." Even putting aside the fact that the trier of fact would not be required or have any reason to determine the truth or falsity of these allegations, the dissent's position is unpersuasive for another reason. That is, the dissent fails to explain how the confidence of the investing public in NYSE Regulation or either of the other two new entities could be affected by a verdict regarding the conduct years earlier at a different entity, the Exchange, of two individuals, Grasso and Langone, who have nothing whatsoever to do with the management of the new entities. But the even more decisive point, to repeat it once again, is that the Attorney General seeks only the recovery from Grasso and Langone of very substantial sums of money that would go to NYSE LLC. The receipt of that money by an entity that would have an unrestricted right to do with it as it pleased—including, for example, transferring it to its for-profit owner, NYSE Group, so that the latter could pay every dollar of it in dividends to its shareholders—would serve no legitimate public interest. Not surprisingly, the dissent does not explain how the receipt of that money by NYSE LLC would enhance or detract from the confidence of the investing public in any of the new entities, NYSE LLC, NYSE Group or NYSE Regulation. As noted above, on the critical issue of standing, the dissent's reliance on the integrity of trading is squarely contradicted by the holding in *Seneci* (817 F2d at 1017-1018).

Indeed, the holding in *Seneci*—that "the state as *parens patriae* lacks standing to prosecute" a suit that "only seeks to re-

cover money damages for injuries suffered by individuals" (817 F2d at 1017)—cannot be reconciled with the dissent's position. The dissent has nothing to say about *Seneci,* and what it does say about the constitutional underpinnings of standing requirements is wrong. As noted above, the dissent asserts that because the New York State Constitution does not contain a textual analogue to the case or controversy clause of the federal constitution (US Const, art III, § 2 [1]), "there is no constitutional concern whatsoever" with construing N-PCL 720 (b) to authorize the continued prosecution by the Attorney General, following the merger of a not-for-profit corporation into a for-profit entity, of causes of action that seek only the recovery of money. In the first place, the standing requirements of the federal constitution hardly derive solely from the case or controversy clause. In fact, as the Supreme Court has stated, "the law of Art. III standing is built on a single basic idea—the idea of separation of powers" (*Allen v Wright,* 468 US 737, 752 [1984]). The existence and fundamental nature of separation of powers principles similarly inhere in the structure of New York's constitutional scheme, which also divides and allocates governmental power among three branches (*see Clark v Cuomo,* 66 NY2d 185, 189 [1985] [referring to "the constitutional principle of separation of powers" and observing that "(t)he doctrine of separation of powers is implied by the separate grants of power to each of the coordinate branches of government"]).[19]

The dissent misses the point when it chides us for "neglect-[ing] to report" that *Raines v Byrd* makes clear that Congress has the authority to override prudential standing limitations (521 US 811, 820 n 3 [1997]). These prudential limitations are *not* constitutional limitations. Rather, they are "judicially self-imposed limits" on the exercise of judicial power (*Bennett v Spear,* 520 US 154, 162 [1997] [internal quotation marks omitted]). The standing requirements of the federal constitution, however, may not be abrogated by Congress (*Raines,* 521 US at

---

**19.** *Matter of Hearst Corp. v Clyne* (50 NY2d 707 [1980]) also makes clear that justiciability requirements are unquestionably of constitutional dimension despite the absence of a case or controversy provision in New York's constitution. Thus, the Court stated that "[i]t is a fundamental principle of our jurisprudence that the power of a court to declare the law only arises out of, and is limited to, determining the rights of persons which are actually controverted in a particular case pending before the tribunal" (*id.* at 713). As the Court immediately went on to observe, "[t]his principle . . . is founded both in constitutional separation-of-powers doctrine, and in methodological strictures which inhere in the decisional process of a common-law judiciary" (*id.* at 713-714).

820 n 3, citing *Gladstone, Realtors v Village of Bellwood*, 441 US 91, 100 [1979]). Thus, at the very least there are serious doubts about whether the Attorney General's continued prosecution of the second, third and seventh causes of action is supported by the minimal constitutional standing requirements of the constitution: "a distinct and palpable injury" to the plaintiff "that is likely to be redressed if the requested relief is granted" (*Gladstone*, 441 US at 100 [internal quotation marks omitted]). Our point, of course, is that "grave and doubtful constitutional questions" (*Jones*, 526 US at 239) are appropriately avoided by construing N-PCL 720 (b) not to authorize the continued prosecution of these causes of action by the Attorney General under the circumstances presented here.

Obviously enough, contrary to the dissent's suggestion, that construction of N-PCL 720 (b) does not entail the proposition "that the Legislature acted unconstitutionally when it enacted [the statute]." The dissent also errs in arguing that our construction of N-PCL 720 (b) "would mean that the Attorney General always loses the claim he is expressly authorized to bring by N-PCL 720 (b) when a merger into a for-profit occurs." In *Seneci,* the Second Circuit affirmed the dismissal of the Attorney General's claim for injunctive relief because he had received in state court all the injunctive relief sought in the federal action (817 F2d at 1017). For that reason, the court ruled that it "need not decide whether the Attorney General, acting as *parens patriae,* has standing to obtain an injunction" (*id.*). Because the Attorney General does not seek injunctive relief against Grasso or Langone in the three causes of action brought pursuant to N-PCL 720 (b), we similarly have no occasion to decide either whether that statute should be construed to authorize the continued prosecution of an action seeking injunctive relief against an officer or director of a not-for-profit corporation after the merger of the corporation into a for-profit entity, or whether the Attorney General would have standing to continue to prosecute such an action. Suffice it to say, however, that whether a plaintiff has standing "depends in substantial measure on the nature of the relief sought" (*Warth v Seldin,* 422 US 490, 515 [1975]; *see also Operation Rescue Natl.,* 80 F3d at 71 [holding that under *Seneci,* New York lacked standing to recover money damages to compensate parties other than the State for harm to their interests stemming from violation of an injunction, but agreeing that "as a party to the proceeding in which the court's order issued, New York has standing to

enforce compliance with that order by seeking injunctive relief, noncompensatory fines, and compensation for any economic loss *New York* may have suffered as a result of the contumacious conduct"]).

The dissent also offers a parade-of-horribles argument to support its position. Thus, it goes so far as to state that to conclude that the Attorney General's standing lapsed when the Exchange became a for-profit entity "would open the door to a feeding frenzy for con men and swindlers to raid assets of not-for-profit corporations they control and then evade prosecution and responsibility by merging with a for-profit corporation." The short and complete answer to this is that, regardless of what might possibly occur with respect to some other not-for-profit corporation, "con men and swindlers" certainly played no role at all in the transactions resulting in the merger of the Exchange into a for-profit entity. But if a case with very different facts than those presented here were to arise in which such malefactors sought to "evade prosecution and responsibility by merging with a for-profit corporation," our holding in this case would not require another court to preclude the continuation, postmerger, of all premerger causes of action under N-PCL 720 (b) brought against the malefactors (*see Kelo v New London*, 545 US 469, 487 [2005] [observing that unusual circumstances in the "hypothetical cases posited by petitioners can be confronted if and when they arise" (footnote omitted)]; *see also Matter of Seelig v Koehler*, 76 NY2d 87, 92 [1990] [distinguishing prior decisions and observing that "the identification and weighing of all the unique and particular facts of each case governs"], *cert denied* 498 US 847 [1990]).[20]

---

**20.** The Attorney General, of course, hardly would be powerless to prevent such a merger (*see e.g.* N-PCL 112 [a] [1]; 907, 908 [f]). Other possibilities include permitting a member of the not-for-profit corporation to continue to prosecute such a cause of action and permitting the Attorney General to continue to prosecute such a cause of action. As for the latter possibility, contrary to the suggestion of the dissent we do not venture an opinion on whether the Attorney General ultimately would be granted standing in such a hypothetical case. We note simply that the Court of Appeals has stated that even with respect to a case in which the Attorney General was seeking only to recover money for a private corporation, "the courts would struggle hard to find authority for the attorney-general to intervene in the name of the people" if that intervention truly were necessary (*Ingersoll*, 58 NY at 17). Obviously, a determination that of necessity the Attorney General has standing, because of the absence of any other "prosecutor capable of pursuing the wrong-doer and redressing the wrong" (*id.*), could be made at the outset of the litigation. Contrary to the dissent, that determination could be made without requiring the

The dissent contends that *Tenney v Rosenthal* (6 NY2d 204 [1959], *supra*) supports its position, but the dissent does not undercut our central point about the decision: the public policy concerns that supported the conclusion in *Tenney* that the director continued to have authority to sue do not support the conclusion in this case that the Attorney General continues to have that authority. And in relying on *Tenney*, the dissent once again commits the error of disregarding this Court's conclusion in *Rubinstein v Catacosinos* (91 AD2d 445 [1983]) that Business Corporation Law § 906 (b) (3) ensures the continuation of a premerger cause of action but not necessarily the continued standing of the party asserting the cause of action. The dissent mistakes our position with respect to article VII, § 8 (1). We do not, contrary to the assertion of the dissent, conclude that the continued prosecution of the three causes of action under N-PCL 720 (b) seeking the recovery of millions of dollars that would go to a for-profit entity would violate the prohibition of article VII, § 8 (1). Rather, our more modest conclusion is that serious constitutional questions would be raised if N-PCL 720 (b) were construed to permit the continued prosecution of these causes of action. The dissent cannot avoid those questions with its observation that the Exchange "was a *private* corporation before it merged with Archipelago Holdings, Inc." The point is that while there is no substantial public interest in most if not all private corporations, there is a substantial public interest in the management and affairs of private corporations organized as a not-for-profit corporations under the N-PCL (*see People v Lowe*, 117 NY at 190-191).[21]

---

Attorney General first "to prove the ultimate merits of his case just to establish his capacity to sue."

**21.** The dissent argues that in *Grasso II* this Court "did not find any constitutional impediments to allowing the Attorney General to prosecute those claims it was authorized to bring pursuant to N-PCL 720, nor should it now." This argument is completely devoid of merit. *Grasso II* involved an appeal by Grasso from the denial of his motion to dismiss the four causes of action that were *not* brought pursuant to N-PCL 720 (b) (42 AD3d at 127). Not only were the causes of action under N-PCL 720 (b) not even before us in *Grasso II*, the motion to dismiss the nonstatutory causes of action that was before us in *Grasso II* was made and argued prior to the merger. Finally, both in Supreme Court and before this Court in *Grasso II*, Grasso argued that the Attorney General's parens patriae authority does not extend to lawsuits seeking recovery for private parties. As we resolved the appeal on a different ground, we had no occasion to address that challenge to the Attorney General's authority (42 AD3d at 143).

### III

Supreme Court granted Grasso's motion to dismiss the eighth cause of action against the Exchange to the extent of dismissing the claim for injunctive relief. That claim sought an injunction "requiring the [Exchange] to adopt and implement safeguards to ensure that all compensation paid in the future are [*sic*] in compliance with the N-PCL," and Supreme Court agreed that it had been rendered moot by the conversion of the Exchange into a for-profit entity. As for the claim for declaratory relief, a declaratory judgment that the Exchange "made unlawful, ultra vires payments to Grasso," Supreme Court rejected Grasso's arguments that: (1) the merger also rendered this claim moot, and (2) there was no "actual controversy" between the Attorney General and the Exchange because the Exchange had pleaded in its answer that the compensation at issue was *"ultra vires."*

■ Grasso's motion to dismiss the claim for declaratory relief was properly denied, but we come to that conclusion for a reason that is not advanced by the Attorney General and was not relied on by Supreme Court. Because the eighth cause of action is asserted solely against the Exchange, Grasso has standing to seek its dismissal only if he would be bound, and therefore aggrieved, by a determination underlying any judgment that the compensation was ultra vires. We are not aware of any basis for concluding that Grasso would be bound by virtue of either the law of the case doctrine or collateral estoppel. Moreover, the absence of an actual controversy between the Attorney General and the Exchange is a reason to conclude that Grasso would not be bound. An issue must be actually litigated for the law of the case doctrine or collateral estoppel to apply (*see Kaufman v Eli Lilly & Co.*, 65 NY2d 449, 456-457 [1985] ["An issue is not actually litigated if, for example, there has been . . . a confession of liability"]; *cf. People v Evans*, 94 NY2d 499, 502 [2000] ["law of the case addresses the potentially preclusive effect of judicial determinations made in the course of a single litigation," and that it "has been aptly characterized as 'a kind of intra-action res judicata'" (quoting Siegel, NY Prac § 448, at 723 [3d ed])]).

### IV

■ Grasso's first and third cross claims for breach of contract properly were dismissed on the Exchange's motion for summary judgment. As the Exchange correctly argues, there is no evidence that Grasso was terminated by the Exchange. To the con-

trary, the relevant facts—as opposed to their legal significance—drawn from the deposition testimony of numerous directors, including Grasso, and the documentary evidence, are undisputed: Grasso told the Board he was not resigning, but that if the Board was asking for his resignation he would tender it; Director H. Carl McCall then told Grasso that the Board was asking him for his resignation; and Grasso then tendered his resignation, which was accepted. There is no evidence that the Board ever told Grasso that he was fired or terminated; the legal opinion advanced by certain directors that Grasso was fired, even though they agreed with the foregoing facts, is of no moment (*see Suarez v Food Emporium, Inc.*, 16 AD3d 152, 153 [2005]). Even if there were evidence that Grasso was threatened with discharge—and there is no such evidence—Grasso's resignation would not thereby have been rendered an involuntary act that was tantamount to a termination (*see Levitz v Robbins Music Corp.*, 6 AD2d 1027, 1027 [1958] ["Resignation is ordinarily a voluntary act, and the fact that plaintiff was threatened with discharge does not constitute such duress as to render the resignation involuntary"]; *see also Nocera v New York City Fire Commr.*, 921 F Supp 192, 202 [SD NY 1996] ["(R)esignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges. Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because the fact remains that plaintiff had a choice. (Plaintiff) could stand pat and fight" (internal quotation marks omitted)]).

In a footnote in his brief Grasso repeats a contention that he made in his memorandum of law in opposition to the Exchange's motion for summary judgment, namely that even if he resigned or was terminated for cause he would be entitled to a SERP payment of some $34 million under the 2003 employment agreement. This contention is based on Grasso's reading of the relevant provisions of section 6.3 of that agreement, entitled "Termination by the Exchange for Cause or Termination by the Executive without Good Reason." Grasso's first cross claim, however, alleges a breach of section 6.2 of the agreement, entitled "Involuntary Termination by the Exchange without Cause or Termination by the Executive for Good Reason." Indeed, the paragraphs of Grasso's amended answer that comprise the first cross claim repeatedly refer to a breach of section 6.2 and the first cross claim bears the following

parenthetical header: "(Breach of § 6.2 of the 2003 Employment Agreement—Against the Exchange)."

In its reply memorandum of law in support of its motion for summary judgment, the Exchange argued that Grasso's theory of liability that he was entitled to a SERP payment of some $34 million under the 2003 employment agreement if he resigned or was terminated for cause could not be "found anywhere in Mr. Grasso's crossclaims, and instead [is] asserted for the first time buried in a few pages in the middle of his summary judgment brief" (emphasis omitted). In addition, the Exchange argued that the parties had litigated the cross claims for more than two years, with the Exchange conducting discovery on the basis of the allegations of a breach of section 6.2. Accordingly, the Exchange argued that Grasso could not raise this theory in opposition to its motion for summary judgment. In granting summary judgment to the Exchange on the first and third cross claims, Supreme Court made no mention either of Grasso's claim that he was entitled to a SERP payment even if he resigned or of the Exchange's position that this theory of liability was untimely.

In the one-sentence footnote in his main brief that Grasso devotes to this theory of liability, he neither contends that it was asserted in his cross claims nor disputes the position taken below by the Exchange that it was untimely. In its brief, however, the Exchange argues that because Grasso had never made such a claim in his cross claims, Supreme Court did not rule, and was not required to rule, on it. In his reply brief, Grasso claims only that his "crossclaims pleaded all that New York law requires: the existence of contract rights that the [Exchange] failed to honor."

Grasso's argument, however, is unresponsive to the Exchange's assertion that he improperly raised a new theory of liability for the first time in opposition to the Exchange's motion for summary judgment. Since Grasso has not argued—let alone demonstrated—that, prior to the Exchange's motion for summary judgment, he raised his claim that he was entitled to a SERP payment even if he resigned, he is precluded from raising it to avoid summary judgment (*see Abalola v Flower Hosp.*, 44 AD3d 522 [2007] ["Plaintiff's physician expert also improperly raised, for the first time in opposition to the summary judgment motion, a new theory of liability . . . that had not been set forth in the complaint or bills of particulars"]; *Mathew v Mishra*, 41 AD3d 1230, 1231 [2007] ["(A) plaintiff cannot defeat an

otherwise proper motion for summary judgment by asserting a new theory of liability . . . for the first time in opposition to the motion" (internal quotation marks omitted)]; *Pinn v Baker's Variety*, 32 AD3d 463, 464 [2006] ["Raised for the first time in opposition to the motion for summary judgment, (a new) theory (of liability) should not have been considered as a basis for defeating summary judgment"]).

■ Finally, Supreme Court properly granted summary judgment dismissing Grasso's fifth cross claim for defamation against both the Exchange and John S. Reed—the interim Chair and CEO of the Exchange at the time he made the statements at issue—and Grasso's second and fourth cross claims against the Exchange. The latter two cross claims (the disparagement cross claims) alleged that the statements Reed made violated provisions of Grasso's 2003 and 1999 employment agreements prohibiting the Exchange from damaging his reputation with "willful intent," or "vindictively disparaging" him. In opposition to the Exchange's and Reed's motions for summary judgment, Grasso failed to adduce evidence sufficient to raise a triable issue of fact with respect to whether the statements were made with "actual malice," i.e., that when Reed made the statements he "entertained serious doubts as to [their] truth" or "had a high degree of awareness of [their] probable falsity" (*Sweeney v Prisoners' Legal Servs. of N.Y.*, 84 NY2d 786, 793 [1995] [internal quotation marks omitted]).[22]

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered October 19, 2006, which, inter alia, (1) granted the Attorney General's motion for summary judgment on liability as to his third cause of action against Grasso, (2) denied Grasso's motion for summary judgment dismissing the second and third causes of action and Langone's motion for summary judgment dismissing the seventh cause of action, (3) denied in part Grasso's motion to dismiss the eighth cause of action asserted by the Attorney General against the Exchange, (4) granted the Exchange's motion for summary judgment dismissing Grasso's first and third cross claims, (5) granted the Exchange's and Reed's motion for summary judgment dismissing Grasso's fifth cross claim, and (6) granted the Exchange's motion for summary judgment dismissing Grasso's second and fourth cross claims, should be modified, on the law,

---

**22.** The parties agree that, like the defamation cross claim, the disparagement cross claims also required proof that Reed either knew the statements were false or was aware of their probable falsity.

to deny the Attorney General summary judgment on liability as to the third cause of action, grant Grasso's motion to dismiss the second and third causes of action, and grant Langone's motion to dismiss the seventh cause of action, and otherwise affirmed, without costs. The Clerk is directed to enter judgment accordingly. Appeal from that part of said order which granted plaintiff summary judgment on the sixth cause of action against Grasso should be dismissed, as moot, without costs.

MAZZARELLI, J.P. (dissenting in part). A detailed discussion of the background of this litigation, including the substance of the complaint, is set forth in our decision in *People v Grasso* (42 AD3d 126 [2007], *lv granted* 2007 NY Slip Op 81807[U] [1st Dept 2007], *appeal by New York Stock Exchange withdrawn* 9 NY3d 998 [2007] [*Grasso II*]), the second of what are now five decisions of this Court arising out of the action. Therefore, the facts recited here are confined to those relevant to the disposition of the appeal. Involved in this appeal are plaintiff Attorney General's motion for summary judgment on liability on his third and sixth causes of action; the motions by cross claim defendants John Reed and the New York Stock Exchange (NYSE) to dismiss five cross claims asserted against them by defendant Richard A. Grasso; Grasso's motion for summary judgment dismissing as against him the second and third causes of action; and defendant Kenneth G. Langone's motion for summary judgment dismissing as against him the seventh cause of action. The Attorney General's allegations, in his third and sixth causes of action, are that Grasso breached his duties to the NYSE by designing and implementing a compensation process that failed to disclose to the NYSE's Board of Directors material information about aspects of his variable compensation (third cause of action), and by negotiating two interest free loans (sixth cause of action). The largest component of Grasso's compensation as CEO of the Exchange was his Supplemental Executive Retirement Plan (SERP). His participation in another program, the Supplemental Executive Savings Plan (SESP), is also relevant to the third and sixth causes of action. The Attorney General's seventh cause of action alleges that Langone breached his fiduciary duty to the NYSE in his role as Chair of its Compensation Committee.

The NYSE's SERP, a nonqualified defined benefit retirement plan, was established in 1984. In 1990, Grasso became entitled to a contractual retirement benefit that was calculated using

the same formula as the NYSE's SERP,[1] with certain modifications. Grasso's SERP benefits were due to be paid to him upon his retirement from the Exchange. However, in negotiating his 1995 employment agreement, Grasso requested an advance from the NYSE in an amount equal to his accrued SERP benefit at the time, $6,571,397. He agreed to offset this amount from his SERP distribution upon retirement, but did not agree to pay interest on the advance. Grasso's 1995 employment agreement, including the $6.57 million advance, was approved by both the NYSE's Compensation Committee and its Board of Directors.

Grasso participated in SESP pursuant to his 1990, 1995, and 1999 employment agreements. SESP permitted eligible executives to deposit, and defer paying income tax on, portions of their compensation until after the termination of their employment. By its terms, SESP prohibited distributions prior to the termination of a participant's employment. Grasso elected to receive his SESP distribution in a lump sum, on the January 1 following the termination of his employment with the NYSE. Throughout his participation in SESP, Grasso received quarterly statements reflecting the value of his participation as well as the allocations he chose for the investment of his funds. As part of his 1999 employment agreement, Grasso negotiated to have $29.9 million (an amount equal to his then accumulated SERP benefit) deposited into his SESP account. As in 1995, he agreed to repay this amount from his ultimate SERP distribution, but he did not pay any interest on the advance. Again, the terms of the 1999 employment agreement were reviewed by both the Compensation Committee and the full Board of Directors.

The NYSE's Compensation Committee met each February to recommend fixed and variable compensation awards for all of its senior executives. The process, from 1997 to 2003, was as follows. Frank Ashen, the NYSE's head of human resources, would collect compensation data from a number of comparable companies. Ashen would then prepare an analysis of each NYSE executive's performance for the year. He would compare the collected data against 65 quantitative measurements to reach a score for each executive. That score comprised 65% of the individual's compensation. The Chair of the Compensation Committee retained discretion to determine the remaining 35% of compensation figures, which he would recommend to the Board. After the Chair made his recommendations, Ashen met individu-

---

1. As the parties all call this contractual benefit program Grasso's SERP, it will be referred to in the same manner here.

ally with each of the members of the Compensation Committee to present and discuss the Chair's salary proposals. On the first Thursday of each February, the Compensation Committee met to discuss and vote on each of the executive's compensation. Later that same day, the full Board of Directors would meet and vote on the same proposals. Grasso did not attend any of the meetings where his compensation was addressed.

The value of Grasso's SERP and SESP was not discussed at the yearly February meetings. However, the executives' annual Incentive Compensation Plan (ICP) awards were evaluated and approved on a yearly basis. The ICP awards had a sizeable impact upon the value of executives' SERP benefits. In May 1999, Grasso's SERP was valued at approximately $36 million. Between 1999 and 2002, Grasso's SERP tripled in value to more than $110 million. The NYSE's total pre-tax profit for 2002 was approximately $56.8 million, about half of Grasso's accumulated SERP for that same year.

The NYSE's Department of Human Resources was aware of the growth of SERP benefits and the potential negative impact of this program on the NYSE's financial future. Thus, in 1998, Bernard Marcus, then Chair of the Compensation Committee, proposed disclosing yearly SERP costs to the Board. However, deposition testimony from Board members reveals that Kenneth Langone, Marcus's successor, did not make any type of annual SERP or SESP disclosure.

By the summer of 2002, Grasso sought to extend his contract and accelerate payment of some of his SERP and SESP benefits. The Compensation Committee held a special meeting. It was at this meeting that some Committee members first learned of the size of Grasso's SERP that would be due upon his retirement. The Committee decided that a third party should be retained to review Grasso's compensation. Langone hired Vedder, Price, Kaufman & Kammholz, a consulting firm, for this purpose. Vedder, Price requested the materials provided to the Compensation Committee for its February 2003 meeting.

Grasso then made a proposal to cap his final pay at $12 million, extend his contract to 2006, and move $56 million of his accrued SERP benefit into his SESP. The Compensation Committee considered this proposal but made no determination on the matter. Then, in January 2003, Grasso, revising his proposal, requested the immediate payment of approximately $140 million in deferred compensation. At its February 2003 meeting, the Compensation Committee did not vote to approve Grasso's

proposal, but referred it for further study of the financial implications for the NYSE.

On August 27, 2003 Grasso executed his fourth employment agreement with the NYSE. That agreement had a new provision, section 3.3 (b), which provided: "in lieu of participation in . . . the SESP, the Exchange [NYSE] shall pay to the Executive [Mr. Grasso] . . . a payment equal to the sum of the amounts credited . . . under the SESP." The 2003 employment agreement also required Grasso to subtract the approximately $6.6 million advanced to him in 1995, and the $29.9 million deposited in his SESP in 1999, from his final SERP benefit award. On the day the 2003 agreement was executed, the NYSE issued a press release revealing that $139.5 million would be immediately payable to Grasso. The press release did not reveal that $48 million was also due to be paid Grasso upon his retirement. In September 2003, the Chair of the Securities and Exchange Commission (SEC) contacted the NYSE and requested information about Grasso's compensation. In response to increasing internal and external pressure, Grasso agreed to forgo future benefit payments. Then, at a September 17, 2003 teleconference Board meeting, Grasso read the following prepared written statement: "[T]he best alternative, it seems to me, is that I should submit my resignation at the next Board meeting if you wish me to do so, for the benefit of the Exchange, and to help preserve what we have tried to build over the last 35 years." Outside of Grasso's hearing, the Board voted in favor of his resignation. Grasso was advised of the vote, and he resigned.

Thereafter, the Attorney General brought this action on behalf of the People of the State of New York for what he alleges was Grasso's excessive compensation. The complaint contains eight causes of action, six against Grasso, one against Kenneth Langone, as Chair of the NYSE's Compensation Committee, and one against the NYSE itself. In his answer, Grasso asserts five cross claims against the NYSE for breach of two of his employment agreements, disparagement, and defamation.[2] In our first decision in this matter, we denied a CPLR 3211 (a) (7) motion by the NYSE and Reed to dismiss Grasso's fifth cross claim for defamation (21 AD3d 851 [2005]). In *Grasso II*, we dismissed the Attorney General's first, fourth, fifth, and sixth causes of action (*see* 42 AD3d at 144).

---

2. Grasso's defamation claim is also asserted against cross claim defendant John Reed, who succeeded him as Chair and CEO of the NYSE.

The order on appeal was issued on October 19, 2006, before *Grasso II* was issued on May 8, 2007. As relevant, it (1) granted the Attorney General summary judgment as to liability on the third and sixth causes of action; (2) denied Grasso summary judgment dismissing as against him the second and third causes of action; (3) denied Langone summary judgment dismissing as against him the seventh cause of action; (4) granted motions by the NYSE and Reed to dismiss all five of Grasso's cross claims; and (5) directed an accounting to determine: (a) how much interest was owed on the loans received by Grasso in violation of N-PCL 716, and (b) how much of the SESP was deferred income actually earned, and how much, if any, contingent SESP had been actually earned or vested prior to Grasso's departure.

In the third cause of action, the Attorney General alleges that Grasso violated the fiduciary duties he owed to the NYSE under N-PCL 717,[3] 720 (a) (1) (A) and (B),[4] and 720 (b), by withholding information about critical aspects of his variable compensation, including his SERP, from the Compensation Committee and the Board of Directors. In the order appealed, the motion court granted the Attorney General summary judgment on this claim, finding that Grasso breached his duties to the NYSE by failing to alert the Board to his SERP balances, and by thwarting the Board's efforts to become informed about the growth of their value. The court further found that the Board never amended the SESP to do away with its prohibition against pretermination distributions.

While the deposition testimony of numerous Board members indicates that they were not aware of the exact value or growth of Grasso's SERP over time, it is unclear that Grasso is solely

---

3. As relevant, N-PCL 717 (a) provides that "[d]irectors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." N-PCL 717 (b) provides that "[i]n discharging their duties, directors and officers, when acting in good faith, may rely on information, opinions, reports or statements . . . prepared or presented" by various individuals, including fellow officers and directors and other agents of the corporation.

4. N-PCL 720 (a) (1) (A) and (B) authorize an action against an officer or director of a not-for-profit corporation to compel an accounting for alleged misconduct concerning "(A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge," and "(B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties." N-PCL 720 (b) also authorizes the Attorney General, among others, to bring such an action against the offending officer or director.

responsible for this group having been uninformed. All of the Board members were financially sophisticated businesspeople. They reviewed and approved the SERP program, which was included and explained in each of Grasso's 1995, 1999, and 2003 employment agreements. Those agreements set forth the formula by which Grasso's SERP was calculated and the fact that ICP awards were a component of Grasso's SERP. In fact, in February and April 2001 and February 2002, the Board classified certain bonuses in a manner that excluded them from SERP eligibility. The Board also ratified the amended 1999 employment agreement so that only 85% of Grasso's future ICP awards would be SERP-eligible. As Grasso's compensation grew and his SERP accumulated, no member of the Board undertook an independent examination into whether the awarded compensation was excessive, or whether accumulating SERP benefits would have deleterious implications for the Exchange. Given that the Board members arguably failed to educate themselves, it cannot be concluded, as a matter of law, on this record, that Grasso is solely responsible for his compensation, or that he failed to exercise his duty of reasonable care and loyalty to the NYSE. The reasonableness of Grasso's actions and whether they comported with his fiduciary duties are fact-sensitive issues that require full exploration before the trier of fact (*cf. Insurance Co. of N. Am. v Manufacturers Hanover Trust Co.*, 106 AD2d 285 [1984]. Accordingly, the court erred in granting the Attorney General partial summary judgment on liability on the third cause of action, and I agree with the majority in vacating the accounting the court directed in that regard.

While I agree with the majority that there is an issue of fact regarding the Board's knowledge as to the value of Grasso's SERP, I disagree with its conclusion that the SESP payments were proper as a matter of law. It is unquestionable that the Board had the authority to amend SESP at any time. However, whether through a formal document amending SESP or some less formal act, the Board must have actually intended to amend it. The United States Supreme Court has made clear that once it is determined that an employee benefit plan may be amended, the inquiry shifts to who is authorized to amend it, and whether those persons "actually" did so (*Curtiss-Wright Corp. v Schoonejongen*, 514 US 73, 85 [1995]). That inquiry is "fact-intensive." (*Id.*)

The majority misstates my position. Evidence of intent to amend a benefits plan does not always require that a "formal"

amendment be prepared. However, there is affirmative evidence in this record that the Board did not intend to amend SESP so as to permit distribution to Grasso, when, on August 7, 2003, it approved the proposed SESP payout to Grasso. Accordingly, on this record, the issue cannot be determined as a matter of law for purposes of summary judgment. Indeed, the record reveals that when the Compensation Committee met to consider Grasso's compensation proposal in February and July 2003, the Committee was not informed that any SESP distribution would contravene SESP. Furthermore, there is no evidence that the Committee addressed the need to amend SESP. Moreover, by resorting to a formal amendment on at least three previous occasions when the Board saw fit to amend SESP, the Board arguably established a course of conduct that undermines Grasso's argument that the payment to him constituted an amendment to SESP. The majority fails to address any of these facts, which raise a triable question as to whether the Board, in authorizing the payment, knew that the payment contravened the terms of SESP such that it needed to be amended. Certainly, if it was not aware of that fact, then the payment cannot be considered an amendment to SESP.

Finally, the parol evidence rule is not, as the majority states, applicable here since the foregoing facts could lead a trier of fact to reasonably infer that the terms of SESP were disregarded as a result of mutual mistake (*see Marine Midland Bank-S. v Thurlow*, 53 NY2d 381, 387 [1981]). Similarly, just as extrinsic evidence may be considered to establish that a writing purporting to be a contract is no contract at all, parol evidence should be permissible here to establish that the 2003 employment agreement was not intended by either party to it to constitute an amendment to SESP (*see Polygram Holding, Inc. v Cafaro*, 42 AD3d 339 [2007]).

In the sixth cause of action, the Attorney General alleged that Grasso received payments in 1995 and 1999 that constituted loans from the NYSE, in violation of N-PCL 716. That section provides:

> "No loans . . . shall be made by a corporation to its directors or officers . . . A loan made in violation of this section shall be a violation of the duty to the corporation of the directors or officers authorizing it or participating in it, but the obligation of the borrower with respect to the loan shall not be affected thereby."

The motion court granted the Attorney General summary judgment on liability on this claim, and also ordered an accounting of interest due on the sums advanced to Grasso. However, in *Grasso II* (again, issued after the order on appeal), this Court dismissed the sixth cause of action, finding it decisive that N-PCL 716 "does not itself authorize the Attorney General or anyone else to bring suit for a violation of its terms" (42 AD3d at 133). We noted that N-PCL 720 (b) authorizes the Attorney General to sue for the relief provided in N-PCL 719 (a), and that the latter section provides for the joint and several liability to the corporation of directors who vote for or concur in " '[t]he making of any loan contrary to section 716' " (*id.*, quoting N-PCL 719 [a] [5]). Under N-PCL 719 (e),[5] however, an officer or director is afforded a good faith defense to the acceptance of a loan.

We found the sixth cause of action deficient because it alleged a right to recover against Grasso "without regard to whether, 'in the circumstances,' he discharged the duties imposed on him by N-PCL 717" (42 AD3d at 133). We also held that the Attorney General's pleading did not assert that Grasso "knew of [the] unlawfulness" of either the 1995 or 1999 advances, which would have been actionable under N-PCL 720 (a) (2) (*id.* at 134).

Because the sixth cause of action was not explicitly authorized by the N-PCL, we found its assertion inconsistent with specific "policy judgments" made by the Legislature, and therefore dismissed it (*id.* at 128). This disposition renders moot those portions of the order on appeal that (1) granted the Attorney General partial summary judgment on liability on that same claim, and (2) ordered an accounting to calculate interest. Accordingly, I concur with the dismissal of the appeal from those portions of the order (*Matter of Standley v New York State Div. of Parole*, 40 AD3d 1344 [2007]).

The Attorney General's second cause of action seeks judgment setting aside all unlawful payments made by the NYSE to Grasso and directing that Grasso return such payments to the NYSE. The claim is brought pursuant to N-PCL 720 (a) (2) and (b); as noted above, the latter provision explicitly authorizes the Attorney General to seek such relief. The third cause of action, which alleges that Grasso breached his fiduciary duty to the

---

5. N-PCL 719 (e) provides that, "[a] director or officer shall not be liable under this section if, in the circumstances, he discharged his duty to the corporation under section 717 (Duty of directors and officers)."

NYSE, relies on N-PCL 720 (a) (1), which the Attorney General was also explicitly authorized to bring under N-PCL 720 (b). Grasso never questioned the Attorney General's authority to bring these causes of action; however, he now posits that such authority has been extinguished. Specifically, Grasso argues that when, on March 7, 2006,[6] the NYSE was merged into Archipelago Holdings, Inc. to create NYSE, LLC, a for-profit company, the authority conferred on the Attorney General by N-PCL 720 ceased to exist.

On its face, this argument is meritless. First, NYSE LLC has two subsidiaries. One is NYSE Market, Inc., a Delaware corporation, and the other is NYSE Regulation, Inc., a New York *not-for-profit* corporation that constitutes the regulatory arm of NYSE LLC. Unquestionably, even were one to accept Grasso's theory, the Attorney General continues to have authority to enforce the N-PCL as it concerns NYSE Regulation, Inc. Moreover, the Attorney General clearly indicated to this Court, in his brief in *Grasso II* (at page 25), and to Supreme Court at oral argument of the motion that resulted in that appeal,[7] that he intends to ask the court, should he prevail in securing a judgment against Grasso, to order that any sums recovered be returned to NYSE Regulation, Inc. This also gives lie to Grasso's argument that since the merger the Attorney General has been pursuing a derivative claim that is strictly for the benefit of a for-profit corporation.

The majority's bare statement that the entity to which the Attorney General intends to direct any recovered monies is irrelevant, because "the right of recovery under these three causes of action belongs to the Exchange's successor, NYSE LLC," is no more than an ipse dixit and does nothing to advance its argument. Certainly, it has not been established that NYSE Regulation, Inc. is some arcane entity that bears no functional relation to the premerger NYSE such that it would be absurd for the Attorney General to have determined that it is the proper beneficiary of any judgment. To the contrary, NYSE Regulation, Inc. is identified in NYSE Group, Inc.'s SEC registration statement as being singularly responsible for moni-

---

6. The merger became final just eight days before the motion court rendered the decision on Grasso's pre-answer motion to dismiss in *Grasso II*.

7. See record on appeal, *Grasso II* (at 365-366), of which we take judicial notice (*see Matter of Allen v Strough*, 301 AD2d 11, 18-19 [2002]). The majority's point that "the Attorney General has never sought to amend the complaint to reflect this intention" is not persuasive, as the Attorney General can seek leave to amend from Supreme Court at any time (CPLR 3025 [b]).

toring member organizations and overseeing their compliance with federal securities laws. These were some of the core functions of the premerger NYSE that was led by Grasso. Accordingly, NYSE Regulation is not a simple "affiliate" of NYSE Group, Inc., as the majority inaccurately describes it. Indeed, by pursuing his claims on behalf of NYSE Regulation, Inc. the Attorney General is merely attempting to "follow the money."

That the court may direct which entity any judgment will benefit, including NYSE Regulation, Inc., has been acknowledged by the NYSE itself. On November 2, 2005, prior to the merger but after Grasso had argued to the motion court on his pre-answer motion to dismiss that the merger plan would provide that any judgment be paid to the for-profit arm of NYSE LLC, an attorney for the NYSE was quoted as saying: "Mr. Grasso's lawyers appear to be mistaken on the facts. It's the Attorney General's lawsuit and if he is successful it will be up to him to propose a remedy and for the court to order it." (Reuters, *Grasso Says no Public Benefit in Payout Return*, Nov. 3, 2005).[8]

Indeed, the SEC registration statement that was filed in connection with the merger by NYSE Group, LLC, the Delaware for-profit entity that owns NYSE LLC, is not inconsistent with that position. There, in describing this action, NYSE Group, LLC stated: "If the New York Attorney General prevails on all of his claims, the court will order Mr. Grasso to return *to the NYSE* portions of his compensation and benefits determined to be unreasonable and declare that the alleged obligation of the NYSE to make further payments is void" (emphasis supplied). The term "NYSE" is specifically stated in the registration statement to refer to "after the completion of the merger, New York Stock Exchange LLC, a New York limited liability company, and its subsidiaries, NYSE Market, Inc., a Delaware corporation, *and NYSE Regulation, Inc., a New York not-for-profit corporation*" (emphasis supplied). Neither the NYSE attorney's comment nor the registration statement is dispositive of whether any judgment will ultimately become an asset of NYSE Regulation, Inc. However, they are each far more probative than what the majority relies on—Grasso's personal interpretation of *pre*-merger filings concerning how NYSE LLC intended to allocate assets to its not-for-profit arm. Accordingly, on this record, it is

8. A printout of the Internet article was included in the supplemental record on appeal for *Grasso II*.

clear that the interests of a not-for-profit corporation continue to be at stake.

Even if there were no surviving not-for-profit element of the new entity, we would still reject Grasso's argument as meritless. The N-PCL expressly anticipates and provides for what happens to litigation pending against a not-for-profit corporation when it is merged into a for-profit entity. Pursuant to N-PCL 908 (i) (A), when a merger or consolidation of a not-for-profit and a garden variety business corporation has been effected, the resulting entity "shall be subject to the business corporation law and the effect of such merger or consolidation shall be the same as in the case of the merger or consolidation of domestic corporations under section 906 (Effect of merger or consolidation) of the business corporation law." Business Corporation Law § 906 (b) (3), in turn, provides that when a merger has been effected:

> "The surviving or consolidated corporation shall assume and be liable for all the liabilities, obligations and penalties of each of the constituent entities. No liability or obligation due or to become due, claim or demand for any cause existing against any such constituent entity, or any shareholder, member, officer or director thereof, shall be released or impaired by such merger or consolidation. *No action or proceeding, whether civil or criminal, then pending by or against any such constituent entity, or any shareholder, member, officer or director thereof, shall abate or be discontinued by such merger or consolidation, but may be enforced, prosecuted, settled or compromised as if such merger or consolidation had not occurred*, or such surviving or consolidated corporation may be substituted in such action or special proceeding in place of any constituent entity" (emphasis supplied).

Thus, the change in status of a not-for-profit corporation into a for-profit corporation has no effect whatsoever upon causes of action that were pending against the not-for-profit at the time of the merger. Moreover, nothing in the N-PCL even suggests that the Attorney General loses his authority to prosecute suits initiated by him against the premerger not-for-profit. Business Corporation Law § 906 (b) (3) would not be "rewrit[ten]," as the majority incorrectly suggests, by permitting the Attorney General to have monies returned to NYSE Regulation. To the

contrary, it would effectuate the Legislature's intent, reflected in N-PCL 908 (i) (A), of ensuring the survival of claims benefitting not-for-profit corporations, notwithstanding that those corporations may have been swallowed up by for-profit entities.

Grasso attempts to evade the consequences of N-PCL 908 (i) (A) by analogizing to this Court's decision in *Rubinstein v Catacosinos* (91 AD2d 445 [1983], *affd* 60 NY2d 890 [1983]). In that case, one business corporation acquired 92% of the shares of another business corporation, and the shareholders of the acquired corporation were forced to sell their shares for cash. We construed Business Corporation Law § 906 (b) (3) to permit "the continuation of [a shareholder's derivative] claim on behalf of the corporation but not to preserve standing of a now nonstockholder to enforce that claim on behalf of the corporation against that corporation's will" (91 AD2d at 447). However, *Rubinstein* is inapposite. First, the Attorney General's claims are not derivative in nature. N-PCL 720 (b), on which this Court placed great reliance in *Grasso II*, was clearly structured by the Legislature to differentiate between derivative actions against not-for-profit corporations and actions brought by the Attorney General:

> "An action may be brought for the relief provided in this section and in paragraph (a) of section 719 (Liabilities of directors in certain cases) by the attorney general, by the corporation, or, in the right of the corporation, by any of the following:
>
> "(1) A director or officer of the corporation.
>
> "(2) A receiver, trustee in bankruptcy, or judgment creditor thereof.
>
> "(3) Under section 623 (Members' derivative action brought in the right of the corporation to procure a judgment in its favor), by one or more of the members thereof.
>
> "(4) If the certificate of incorporation or the by-laws so provide, by any holder of a subvention certificate or any other contributor to the corporation of cash or property of the value of $1,000 or more."

Had the Legislature meant that claims brought by the Attorney General are derivative in nature, then it would have drafted the statute so that the Attorney General would have been included as one of the persons specifically enumerated as entitled to

bring actions "in the right of the corporation." As this Court stated in *Grasso II*, the Legislature is " 'presumed to have investigated the subject, and to have acted with reason, not from caprice' " (42 AD3d at 139, quoting *Farrington v Pinckney*, 1 NY2d 74, 88 [1956]). Not surprisingly, the majority fails to explain why it believes this presumption does not apply to N-PCL 720 (b).

The majority unreasonably dismisses the fact that the statute differentiates between claims brought by the Attorney General and those brought "in the right of the corporation." The statute recognizes that the Attorney General brings his claims in his capacity as the State's chief law enforcement officer, not merely as a surrogate for the corporation. This is not an irrelevant distinction, as the majority says. To the contrary, the distinction makes all the difference. The Attorney General is not merely standing in the NYSE's shoes. The statute is written to authorize the Attorney General to bring a unique claim that is expressly distinct from that of a shareholder, officer or director suing derivatively on behalf of the corporation. Furthermore, N-PCL 908 (i) (A) preserves that claim notwithstanding the precise event that occurred here, i.e., the merger of the not-for-profit into a for-profit entity. That merger does not extinguish the claim, nor the Attorney General's standing or authority to bring it. Accordingly, my analysis of Business Corporation Law § 906 (b) (3) is sound and would have required no different result in *Rubinstein*. Unlike the case of a shareholder's derivative claim, which can be prosecuted by a variety of other persons if the shareholder loses capacity, only the Attorney General can maintain the claim carved out by N-PCL 720 (b) exclusively for him.

Moreover, there is no evidence that the Legislature intended that a claim brought by the Attorney General pursuant to N-PCL 720 (b) would be extinguished because of a merger into a for-profit corporation. To construe the statute in that manner would be contrary to the clear language of N-PCL 908 (i) (A), and would lead to the absurd result of the Attorney General's capacity being dependent on the not-for-profit maintaining that status throughout the litigation. This would diminish his ability to execute his mission and would encourage changes in status simply to evade his reach. Indeed, it would wrest control of prosecutions against not-for-profit corporations from the Attorney General and deliver that control squarely into the hands of those accused of wrongdoing.

Even if one were to agree that the Attorney General's claims are "in the right of the corporation" (despite that the relevant statute states otherwise), *Rubinstein* is a poor analogy to this case. *Rubinstein* is distinguishable because there the plaintiff was an ordinary shareholder in the corporation on whose behalf he sued. As the Court of Appeals stated in *Tenney v Rosenthal* (6 NY2d 204, 211 [1959]), "[t]he shareholder is under no fiduciary duty to the corporation prior to the institution of the action. When he sues derivatively, he does so as a volunteer insofar as his fellow shareholders are concerned; he is authorized to proceed only because of his proprietary interest in the corporation." Indeed, *Tenney* is a much more instructive precedent. There, the plaintiff was a director who brought a derivative action. While the action was pending, he failed to gain reelection to the board. Defendants moved to dismiss the action, arguing that the plaintiff lost his capacity when he lost his seat on the board. The Court of Appeals rejected this argument. In contrast to the shareholder's derivative action, the Court stated, the director's

> "right to sue is based on the public policy declared by the Legislature upon enactment of the statute. We may assume that the right to bring suit has been granted in order to facilitate and improve the director's performance of the 'stewardship obligation' which he owes to the corporation and its stockholders and to protect him from possible liability for failure to proceed against those responsible for improper management of the corporate affairs" (*id.*).

Here, too, the Attorney General's right to sue reflected the Legislature's public policy determination that it is in the public interest for the Attorney General to police not-for-profit corporations. Borrowing the analogy proposed by the Court in *Tenney*, that the nature of a corporate director is akin to a guardian ad litem, the majority suggests that the NYSE is "of age and no longer needs the guardian's protection." However, as stated above, that theory is in contravention of what the Legislature determined when it provided that all causes of action commenced against a not-for-profit corporation continue despite its merger into a for-profit corporation, regardless of who initiated them. In the absence of a legislative pronouncement to the contrary, the Attorney General's standing and capacity continue, just as a guardian ad litem's fiduciary duties continue notwith-

standing that he may have become "a stranger to his ward" (*Tenney*, 6 NY2d at 211-212).

To adopt Grasso's creative reasoning would mean that the Attorney General always loses the claim he is expressly authorized to bring by N-PCL 720 (b) when a merger into a for-profit occurs, notwithstanding that the statute states that the merger ought to be treated as if it never happened.[9] It would open the door to a feeding frenzy for con men and swindlers to raid assets of not-for-profit corporations they control and then evade prosecution and responsibility by merging with a for-profit corporation. Certainly this Court cannot countenance such a legal sleight-of-hand. The majority counters that the Attorney General could preserve his capacity to continue prosecuting an action where the merger is a sham. To establish that, however, the Attorney General would most likely have to prove the ultimate merits of his case just to establish his capacity to sue. This would turn the doctrine of justiciability on its head because, "[w]hether a person seeking relief is a proper party to request an adjudication is an aspect of justiciability which must be considered at the outset of any litigation" (*Matter of Dairylea Coop. v Walkley*, 38 NY2d 6, 9 [1975]).

Another analogy to this case that is similar to the one presented by *Tenney* is where the corporation dissolves during the pendency of the action. In that event, "the shareholder's interest does not abruptly end. At a minimum, the stockholder possesses a substantial interest in the distribution of corporate assets" (*Independent Inv. Protective League v Time, Inc.*, 50 NY2d 259, 264 [1980]).

Here, the Attorney General continues to possess a "substantial interest" in seeing this enforcement action through to its conclusion. This case is not merely about recouping an excessive amount of compensation. While that is the immediate remedy sought, the Attorney General's complaint makes clear that the

---

9. The majority's statement that its position would not necessarily result in the loss of all claims because the law is unsettled as to whether the Attorney General might be able to continue a hypothetical claim for injunctive relief pursuant to his parens patriae authority, despite the merger, does nothing to advance the discussion. The issue on this appeal is whether the claims that are expressly authorized by N-PCL 720 (b), and do not rely on the Attorney General's parens patriae authority, survive merger with a for-profit. Moreover, given the majority's expressed disdain for the Attorney General's parens patriae authority to proceed against Grasso in any respect, we hardly believe that the majority would have given any consideration to such a claim if it had been pleaded.

gravamen of this action is to restore the integrity of an institution to which the perception of integrity is of the utmost importance to the investing public. Indeed, the complaint contains specific allegations of potentially unethical activities that go beyond the sheer amount of Grasso's pay. For example, it asserts that Grasso intimated to Compensation Committee members that if they took positions favorable to him, he would seek to assist them and their companies in connection with their dealings with the NYSE. (Complaint ¶¶ 25-31.) The complaint also alleges that Grasso discussed his pay proposal with NYSE specialists and other "floor Directors" whom the NYSE regulated, and who in fact were being investigated by the NYSE at the time of the conversation (Complaint ¶ 141). Now that such allegations have been made, the people of this state have the right to have them heard so that they may know whether the NYSE is deserving of the confidence they place in it. The effect that the Attorney General's sudden loss of capacity would have on these allegations is not addressed by the majority.

By stating that Business Corporation Law § 906 (b) (3) allows for the Attorney General to lose his capacity to sue in these circumstances, the majority is contradicting this Court's own pronouncements in this very litigation. We held in *Grasso II* that authority to sue not expressly vested in the Attorney General by statute may not be granted by judicial fiat:

> "Because of the Legislature's plenary authority over its choice of goals and the methods to effectuate them, 'a private right of action should not be judicially sanctioned if it is incompatible with the enforcement mechanism chosen by the Legislature or with some other aspect of the over-all statutory scheme . . . '[w]here the Legislature has not been completely silent but has instead made express provision for civil remedy . . . the courts should ordinarily not attempt to fashion a different remedy' " (42 AD3d at 136-137, quoting *Sheehy v Big Flats Community Day*, 73 NY2d 629, 634-635, 636 [1989]).

Here, the Legislature stated that all causes of action initiated against a not-for-profit are to continue unabated. Neither Grasso nor the majority offers any controlling authority, other than the readily distinguishable *Rubinstein*, for the proposition that under these circumstances the Attorney General should

lose his capacity to continue prosecuting such claims. Accordingly, to extinguish the Attorney General's capacity to sue would be by the same judicial fiat upon which this Court frowned in *Grasso II.*

*People v Ingersoll* (58 NY 1 [1874]), *People v Lowe* (117 NY 175 [1889]) and *People of State of N.Y. by Abrams v Seneci* (817 F2d 1015 [1987]), on which the majority relies, do not change my analysis. None of those cases involved a statute, such as N-PCL 720, that specifically authorizes the Attorney General to seek recovery of monies belonging to a private corporation. Indeed, this fact was noted in both *Ingersoll* and *Lowe,* which predate the enactment of the N-PCL by, respectively, 95 and 80 years.[10] In the former case, the Court stated:

> "[I]n the absence of any fraud or collusion on the part of the governing body of the county in the perpetration of the wrong and commission of the fraud, or any inability or disinclination of the proper officers of the county to prosecute, if the money was the property of the county, property belonging to its treasury, and the robbery and wrong was against the county, whether the money was held upon any particular trust, or was applicable to the general purposes of the county, or was incapable of use for county purposes, *except by legislative permission,* there would be no necessity or occasion for the intervention of the people or their attorney-general, as there might be if the authorities of the county— the trustees in fact—had been participants in the fraudulent abstraction of the moneys, or accessories to the frauds by refusing to prosecute" (58 NY at 19-20 [emphasis added]).[11]

In *Lowe,* the Court, after concluding that the Attorney General had no general authority to seek vindication of strictly private rights, turned to a lengthy inquiry into whether "there

---

**10.** The *Seneci* court did not discuss, as did *Ingersoll* and *Lowe,* whether the outcome would have been different in that case if the Attorney General's claims had been specifically authorized by statute. Presumably, however, had there, like here, been a statute in that case authorizing the Attorney General to bring the claims, the claims would have been sustained.

**11.** As stated by the *Ingersoll* dissent, "[i]t seems to be conceded, in all the discussions upon the subject before and within the court, that if the attorney-general had been specially authorized by act of the legislature to bring this action, such authority would be valid and sufficient to sustain the action" (58 NY at 44).

are any statutes which require a modification of these views" (117 NY at 192). The majority states that *Ingersoll* and *Lowe* are persuasive because there is no statute that expressly states that the Attorney General maintains his capacity to sue despite the merger of a not-for-profit corporation into a for-profit. However, there is no need for such a statute here because N-PCL 720 (b) and 908 (i) (A) already provide that the Attorney General's claims against a not-for-profit (and, by necessity, his capacity to bring them) survive the merger. There is nothing to suggest that the Legislature meant otherwise.

The "constitutional question" that the majority seeks to avoid by reading N-PCL 908 (i) (A) to strip the Attorney General of his ability to maintain his claims is fictitious. The case it relies on, *Raines v Byrd* (521 US 811 [1997]), addresses the requirement of article III of the United States Constitution that for a plaintiff to have standing (as discussed below, a concept distinct from "capacity" or "authority" to sue) there must be a "case or controversy." However, the "case or controversy" doctrine "has no analogue in the State Constitution" (*Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 772 [1991]). Accordingly, there is no constitutional concern whatsoever.

Even if the Federal Constitution were determinative of standing in this case, there would nonetheless be no constitutional question. The majority flatly misconstrues footnote 3 in *Raines* (521 US at 820). The footnote stands only for the proposition that Congress may never confer standing on a plaintiff who would not otherwise have constitutional standing (*id.*, citing *Gladstone, Realtors v Village of Bellwood*, 441 US 91, 100 [1979]), i.e., a plaintiff who has not "suffered a distinct and palpable injury to himself that is likely to be redressed if the requested relief is granted" (*Gladstone* at 100 [internal quotation marks and citation omitted]). Indeed, the majority neglects to report that the footnote explicitly acknowledges that Congress may confer standing where the plaintiff has suffered the requisite injury even if he would otherwise lack "prudential" standing because he is not the person best suited to assert a particular claim.

The only type of standing Grasso can possibly claim the Attorney General lacks at this juncture is "prudential" standing. This is because Grasso has never argued here that the Legislature acted unconstitutionally when it enacted N-PCL 720 because the people of this state do not always suffer an "injury" when officers or directors of a not-for-profit corporation waste

corporate assets. Indeed, if that were his position, he would presumably have moved at the outset to dismiss all of the causes of action against him, even those that the statute explicitly grants to the Attorney General, relying on his theory that there is no quasi-public interest at issue in this case. If the initial grant of standing to the Attorney General were constitutional, then, even if he lacked "prudential standing," the Legislature's decision to permit the Attorney General's standing to survive a merger with a for-profit entity would unquestionably pass muster under the United States Constitution.

It is significant that Grasso has never attacked the Attorney General's standing, as opposed to his capacity or authority, to bring his claims, as such a failure constitutes a waiver of that defense. Capacity to sue is "conceptually distinct" from standing to sue (*Silver v Pataki*, 96 NY2d 532, 537 [2001]). While Grasso has nominally framed his argument as involving standing, the argument in fact involves capacity. This Court has held that because the two defenses are distinct, they must both be separately preserved pursuant to CPLR 3211 (e) (*Security Pac. Natl. Bank v Evans*, 31 AD3d 278, 279, 280-281 [2006], *appeal dismissed* 8 NY3d 837 [2007]). Because Grasso has never, other than nominally, invoked standing, as opposed to capacity, as a defense, he has waived it.

The majority's argument that to recognize the Attorney General's standing would violate the separation of powers doctrine is particularly ironic. To the contrary, the three branches of government are in perfect harmony here. The Legislature, by enacting N-PCL 720 and 908 (i) (A), granted the executive branch, in the person of the Attorney General, authority to seek judicial relief under the very circumstances that exist here. The result favored by the majority, in which the judicial branch would refuse to hear claims expressly granted by the Legislature to the executive, would trample on the concept of separation of powers.

Finally, there is no rationality to the new argument, found only in the majority's writing and in none of the parties' briefs, that an endeavor so important as seeking to ensure the integrity of the NYSE constitutes an improper use of public funds. Likewise, the argument that the continued prosecution of the Attorney General's claims runs contrary to the prohibition of article VII, § 8 (1) of the New York Constitution, also made solely by the majority, is without basis in fact, statute or precedent. That clause generally prohibits the State from subsidizing

the activities of private corporations and is in no way implicated in this controversy. Indeed, the NYSE was a *private* corporation before it merged with Archipelago Holdings, Inc., albeit a not-for-profit. This Court in *Grasso II* did not find any constitutional impediments to allowing the Attorney General to prosecute those claims he was authorized to bring pursuant to N-PCL 720, nor should it now.[12]

Of course, the Attorney General need not offer any justification for why he maintains his capacity to sue despite the merger. Nor need he explain why his expenditure of public funds in pursuit of his claims is proper. As discussed at the outset, Grasso's argument about capacity to sue and the majority's theory about the appropriateness of state subsidization of a private matter both rest on the fallacy that the merger resulted in the extinguishment of any not-for-profit that the Attorney General was empowered to police. That is simply not the case. Again, the new entity includes a not-for-profit. Accordingly, the Attorney General's capacity to seek disgorgement by Grasso of his compensation to that not-for-profit is expressly authorized by N-PCL 720.

Grasso's first and third cross claims allege that the NYSE breached section 6.2 of his 2003 and 1999 employment agreements by failing to award him termination benefits. Grasso contends that he was terminated involuntarily, without cause, and that section 6.2 of his employment agreements entitles him to a termination award. The language of section 6.2 is identical in Grasso's 1999 and 2003 employment agreements. It provides:

> "Involuntary Termination by the Exchange without Cause or Termination by the Executive for Good Reason. If the Executive is involuntarily terminated by the Exchange without Cause in accordance with Section 5 (c) above or the Executive terminates his employment for Good Reason in accordance with Section 5 (d) above, [benefits flow]."

Section 5 (c) and (d) of the 1999 and 2003 employment agreements are consistent in the requirement of "written notice" of termination.

Here, Grasso read a prepared statement at a Board meeting offering to "submit [his] resignation . . . if [the Board] wish[ed

---

**12.** As conceded by the majority, this constitutional argument was not raised on the prior appeal. It should also be emphasized, however, that it was also not raised on this appeal by the parties and is found only in the majority's writing.

him] to do so." At the same meeting, the Board voted in favor of Grasso resigning, and he agreed to do so. He now contends that because the Board asked him to submit his resignation, he was effectively involuntarily terminated without cause, triggering section 6.2.

The law is settled that an individual who resigns, even in the face of inevitable termination, has not been terminated (*Nocera v New York City Fire Commr.*, 921 F Supp 192, 201 [SD NY 1996]; *Matter of Biegel v Board of Educ. of Ellenville Cent. School Dist.*, 211 AD2d 969, 970 [1995]). On this record, there is no evidence that the Board was contemplating terminating Grasso. Thus, Grasso's resignation was voluntary.

In any event, even if we were to conclude that Grasso was terminated, his claim for benefits would be precluded by General Obligations Law § 15-301 (4), which states:

> "If a written agreement or other written instrument contains a provision for termination or discharge on written notice by one or either party, the requirement that such notice be in writing cannot be waived except by a writing signed by the party against whom enforcement of the waiver is sought or by his agent."

As the parties agree that no written notice of resignation or termination was issued by Grasso or the NYSE, Grasso's first and third cross claims for termination benefits were properly dismissed (*see Jaffe v Paramount Communications*, 222 AD2d 17 [1996] [where employment agreement requires written notice of termination, alleged oral notice is insufficient to effect contractual termination]).

After Grasso resigned, John Reed became the Interim Chairman and CEO of the NYSE. Reed retained Daniel Webb, Esq. and his law firm, Winston & Strawn, to represent the NYSE in an inquiry by the SEC related to Grasso's compensation. The firm conducted a three-month investigation, which included extensive document review, interviews of more than 60 directors and employees of the NYSE, and obtaining analyses by experts in compensation. In December 2003, Winston & Strawn provided Reed with a copy of a written report (the Webb report) summarizing the information obtained in its investigation.

Subsequently, Reed made a remark that was quoted in the December 21, 2003 New York Times. His statement reads: "If you read this report [referring to the Webb report] and if you were trained in the law, you would say that there is information

in that report that would support a potential legal action" (Mc-Geehan and Thomas, *Next for the Big Board, To Sue or Not to Sue?*, New York Times, Dec. 21, 2003, sec 3, at 31). On January 8, 2004, the NYSE also issued a press release that Reed had informed the SEC and the New York Attorney General that the NYSE Board "had reviewed and discussed the [Webb] report, concluding that 'serious damage has been inflicted on the Exchange by unreasonable compensation of the previous Chairman and CEO, and by failure of governance and fiduciary responsibility that led to the compensation excesses as well as other injuries.' " In his fifth cross claim, Grasso contended that these statements constituted actionable defamation by the NYSE and Reed. By order entered March 25, 2005, the motion court granted the NYSE's and Reed's CPLR 3211 (a) (7) motion to dismiss. However, on appeal, this Court reversed and reinstated the defamation claim (21 AD3d 851 [2005], *supra*). Our order held that a factual issue was presented as to whether "the ordinary and average reader was likely to have understood the [challenged] statements in a defamatory sense" (*id.* at 852 [internal quotation marks omitted]). Given that the statements concerned allegations that Grasso's compensation was excessive, we also concluded that "whether the defamatory implications (if any) of the statements were of and concerning Grasso is also a question for the trier of fact" (*id.* [internal quotation marks omitted]). Our order concluded that "[w]hether Grasso (who concedes that he is a public figure) will be able to sustain his burden of proving actual malice at trial cannot be determined at this prediscovery stage of the litigation" (*id.* at 853, citing, inter alia, *Arts4All, Ltd. v Hancock*, 5 AD3d 106, 109 [2004]).

Subsequent to substantial discovery, including the contents of the Webb report, the NYSE and Reed moved for summary judgment on the same cross claim. In the order appealed, the motion court granted the motion, finding Grasso's submissions insufficient to substantiate the required element of his claim that the challenged statements were made with actual malice. I agree.

A public figure[13] may not recover damages for defamation unless he or she establishes that an offending false statement was made with "actual malice," defined as either actual "knowledge that [the offending statement] was false or with reckless disregard of whether it was false or not" (*see New York Times Co. v*

---

**13.** Grasso does not dispute that, for purposes of evaluating his defamation claim, he is a public figure.

*Sullivan*, 376 US 254, 279-280 [1964]; *Freeman v Johnston*, 84 NY2d 52, 56 [1994], *cert denied* 513 US 1016 [1994]; *Prozeralik v Capital Cities Communications*, 82 NY2d 466, 474 [1993]). It is the plaintiff's burden to show actual malice (*see Mahoney v Adirondack Publ. Co.*, 71 NY2d 31, 39 [1987]), including proving, with clear and convincing evidence, the falsity of factual assertions, or the declarant's entertaining serious doubt as to their truth (*Freeman*, 84 NY2d 56; *Prozeralik*, 82 NY2d at 473).

Here, Grasso contends that Reed's statements were a distortion of the Webb report. However, a review of the report, which was before the motion court on this motion and is in the record on appeal, reveals the same criticisms of Grasso as related in Reed's statements. Further, the conclusions of the Webb report were also consistent with the opinions of the independent executive compensation consultants hired to analyze Grasso's compensation.

Thus, there is no evidence that Reed's statements were false. Further, there was no evidence, let alone, clear and convincing evidence, that Reed entertained any doubt about the truth of the findings in the Webb report (*see Present v Avon Prods.*, 253 AD2d 183, 188 [1999], *lv dismissed* 93 NY2d 1032 [1999]). While Grasso may have disagreed with many of that report's conclusions, he presented nothing in opposition to the motion that calls its veracity into question. Accordingly, I agree with the majority's conclusion that Grasso's fifth cross claim for defamation was properly dismissed.

Grasso's second and fourth cross claims assert that the alleged defamatory statements also constituted disparagement by the NYSE in breach of section 8.9 of the 2003 and 1999 employment agreements. That section provides:

> "During the Employment Term . . . and thereafter, the Exchange by formal announcement or by statements of an officer thereof shall not *with willful intent* damage the reputation of, or *vindictively* disparage, the Executive, provided that the foregoing shall not apply to (i) actions or statements taken or made by the Exchange in good faith, . . . (iii) as the Exchange in good faith deems necessary to rebut any untrue or misleading public statements made about the Exchange, and (iv) statements made in good faith by the Exchange to rebut untrue or misleading statements made about the Exchange" (§ 8.9 [b] [emphasis supplied]).

Grasso contends that through Reed's statements, the NYSE violated section 8.9 of his employment agreements. However, as noted with respect to the defamation claim, Reed was entitled to rely and comment on the findings set forth in the Webb report. Because there is no evidence that Reed acted "vindictively" or with "willful intent" to damage Grasso's reputation by relating the contents of the report, Grasso's contractual disparagement claims were properly dismissed.

SAXE and BUCKLEY, JJ., concur with McGUIRE, J.; MAZZARELLI, J.P., dissents in part in a separate opinion.

Order, Supreme Court, New York County, entered October 19, 2006, modified, on the law, to deny the Attorney General summary judgment on liability as to the third cause of action, grant Grasso's motion to dismiss the second and third causes of action, and grant Langone's motion to dismiss the seventh cause of action, and otherwise affirmed, without costs. The Clerk is directed to enter judgment accordingly. Appeal from that part of said order which granted plaintiff summary judgment on the sixth cause of action against Grasso dismissed, as moot, without costs.